520 A.2d 1195

**Josephine M. FRATANGELO, Appellant,**

**v.**

**Anthony FRATANGELO.**

Superior Court of Pennsylvania.

Argued June 5, 1986.

Filed Feb. 4, 1987.

488

John M. Kish, Pittsburgh, for appellant.

James Beck, Pittsburgh, for appellee.

Before CIRILLO, President Judge, and TAMILIA and POPOVICH, JJ.

TAMILIA, Judge:

This appeal is taken from a decree of equitable distribution of marital property, alimony and counsel fees. The action was commenced in 1981 by the wife, Josephine Fratangelo, against the husband, Anthony Fratangelo; a decree in divorce between the parties was entered by the court July 1, 1983. Subsequent thereto, after trial on claims for equitable distribution, alimony and counsel fees, a decree nisi was entered ordering equitable distribution and denying wife's claim for alimony and counsel fees. Thereafter, following post-trial motions, the wife filed this appeal to the Order dated September 27, 1985, which made the decree nisi, dated June 25, 1985, a final Order.

The husband and wife were married on May 2, 1964, this being the second marriage of the wife and the first marriage of the husband. At the time of trial, the wife was fifty-three (53) and the husband, fifty (50); no children were born of their marriage. After four and one-half years of living together, the parties separated, the husband leaving the marital residence in December, 1968. Prior to the marriage, the husband lived with his mother and was employed by JAF, Inc., a family business, of which he and his brother were the sole shareholders. At the time of incorporation, in January 1964, JAF, Inc. was thinly capitalized and had little or no assets. Prior to the marriage, the wife lived

in her deceased mother's residence with her daughter from a previous marriage, and she had accumulated savings totalling approximately $13,000, most of which was advanced to the husband for his business, JAF, Inc., for liquidating certain outstanding debts of the husband and to establish joint accounts for the husband and wife. Prior to marriage, the husband had virtually no assets other than his interest in JAF, Inc. and two undeveloped building lots in Port Charlotte, Florida, for which he was paying on an installment basis the sum of $20 per month. In 1965, the husband transferred two shares of his stock in JAF, Inc. to his sister, Nina Noonan. Those two shares, at the time of trial, represented all of the issued and outstanding shares in the corporation.

During the marriage and prior to separation, the parties purchased a residential building lot in Bethel Park, Pennsylvania from the wife's sister for the sum of $4,000. Two thousand-five hundred dollars of the purchase price came from the wife's inheritance from her mother's estate and the balance was provided from a loan against the wife's passbook savings. A construction loan in the amount of $22,500 was obtained from Mt. Washington German Savings and Loan Association and a dwelling was built on the lot. An additional $3,700 was expended from the wife's savings for construction to pay for block, the plumbing and heating system and carpeting. The parties took up residence in the dwelling when it was completed in October, 1967.

The parties separated in 1968 and shortly after separation, in January, 1969, the husband filed a complaint in divorce to which the wife filed an answer and counterclaim, claiming alimony pendente lite from the husband. In 1970, the wife obtained employment as a teller at First Federal Savings and Loan Association. From the inception of the marriage until 1970, the wife remained in the home as a homemaker and housewife. From 1969, when the divorce action was commenced by the husband, the parties went through numerous hearings on enforcement and contempt,

including two separate appeals by the husband to this Court as a result of husband's failure to pay alimony pendente lite. During this time, the husband resigned from his position of President of JAF, Inc. and transferred the remainder of his stock to the corporation for the sum of $1,400. While the husband was before the court for contempt for failure to pay sums to the wife as ordered, his accountant testified as to how poorly JAF, Inc. was doing, that it lost in excess of $15,000 for the first three quarters of the year and that its outlook for survival was dim. However, the corporate income tax returns for the same year reflect a profit of $2,372.04, representing at least a $17,372.04 profit swing. The corporation acquired new business quarters in November, 1971, which also became the rentfree residence of the husband, who was, after his resignation as President, employed by the firm as an "outside salesman".

In 1972, Mt. Washington German Savings and Loan Association, the mortgage holder on the Bethel Park residence, commenced foreclosure proceedings. Even though the husband was aware of these proceedings, which resulted in part from the husband's failure to comply with Orders requiring monthly payments to the wife, he refused to take any action to stop the foreclosure. The wife, therefore, was forced to borrow $2,000 from her brother, the funds being used to cure the delinquency on the mortgage and stop the foreclosure. The divorce action was discontinued in 1974 by agreement and the husband was ordered to pay all past due real estate taxes and future real estate taxes on the Bethel Park residence in lieu of alimony pendente lite. Since that time, the wife has continued to make all of the mortgage payments, has paid all utility bills, maintains insurance on the dwelling and has paid for all repairs and maintenance. In addition to normal maintenance and upkeep, the wife replaced the roof for $6,000, with money partially borrowed from a sister and partially in the form of a Home Improvement Loan. She also expended at least $1,200 for landscaping the lot. The husband has made no contribution to the

upkeep and maintenance of the dwelling despite requests for his assistance on several occasions.

The wife's gross income for 1982 from her employment as a head teller, which she held for three years prior to the trial date, was $12,843.88.

The husband resides rent-free in the premises owned by JAF, Inc. He continues to hold the position of "outside salesman". During 1979 he earned wages and bonuses of $25,000, in 1980, $33,333, and in 1981 his wages and bonuses were $21,500, all from his position of "outside salesman". During 1980, JAF, Inc. loaned the husband sums in excess of $100,000, interest free, from which he earned interest of $18,855 in 1980 and $11,535 in 1981. JAF, Inc. also loaned the husband $25,000 to buy a computer which he leases to JAF, Inc. Additionally, the husband receives the benefit of the unrestricted use of two of the four company cars, available to the husband and his sister, as they are the only employees of JAF, Inc. The husband testified he has paid back the interest-free loans and that he now receives a salary from JAF, Inc. of $1,500 per month.

The husband, his sister and the accountant for JAF, Inc. testified that JAF, Inc. had lost its only product line and that the company was on the verge of being dissolved due to a lack of sales. The husband testified he continues to draw his $1,500 per month salary, but the prospects look dim for the entity, JAF, Inc. He also testified that irrespective of the loss of its only product line and no sales and its dim prospect for survival, he had not contemplated or sought other employment.

At the time of trial, the husband had certificates of deposit valued at approximately $25,000 and an Individual Retirement Account of approximately $11,000.

On June 25, 1985, Judge Lawrence Kaplan of the Court of Common Pleas of Allegheny County filed an Opinion and Decree Nisi, wherein he placed a value of approximately $111,000 on the Bethel Park residence. The residence was awarded to the wife provided she pay $40,000 to the husband within sixty (60) days, $100,000 being the equity after

considering the first mortgage of $11,000. The Order further provided that upon the failure of the wife to pay $40,000 to the husband within sixty (60) days, the house should be sold and the net proceeds divided sixty percent to the wife and forty percent to the husband. Further, pending sale, the wife was to pay husband $333.33 per month representing ten percent interest on his $40,000. The Order further provided that all other claims would be dismissed.

The wife filed post-trial motions and raised therein the issues raised here on appeal. Those exceptions, as well as exceptions filed by the husband, were dismissed by the lower court, following which this appeal was filed by the wife.

The issues presented to this Court on appeal are as follows:

1) The trial court erred by establishing a fifty-fifty starting point for making an award of equitable distribution of marital property;

2) The trial court erred in concluding that the only marital asset to be dealt with was the residence at 987 Clifton Road;

3) The trial court erred in requiring payment of the husband's distributive share, by the wife, within sixty (60) days and imposing interest payments of $333.33 per month thereafter for failure to make the payment;

4) The trial court erred in failing to award alimony and counsel fees summarily, without setting forth reasons as mandated by 23 P.S. 501(d).

We will deal with each of the issues seriatim, the most involved being the first.

■ The opinion and reasoning of the trial court in this case illustrates the fallacy of using as a starting point a fifty-fifty division of the marital property, which in this case is the marital residence. In a rather summary fashion, the trial court disregarded, as irrelevant and diversionary, most of the testimony having to do with the factors required to

be considered by the Divorce Code, 23 P.S. 401(d).[1] If the court had followed the mandate of the Code and considered, reviewed and applied those factors prior to determining whom to favor and equitable distribution of the marital property, it is inconceivable that the division of the marital home would have been sixty-forty. By applying a presumption that marital property is to be divided fifty-fifty (stated as a starting point), with whatever adjustments to that division which might be occasioned by considering 401(d) factors, the court felt no compulsion to evaluate and apply those factors to the total value of the property but could conveniently discuss some of them in generalities and make a division without serious application, which is patently unfair. In particular, the court's failure to take into full account the husband's dereliction and the wife's contribution pursuant to section 401(d)(7) is a glaring departure from the mandate of the Code.

This is the first instance where this Court has taken the opportunity to review what has quickly become the wide-

1. **23 P.S. § 401(d)**

(d) In a proceeding for divorce or annulment, the court shall, upon request of either party, equitably divide, distribute or assign the marital property between the parties without regard to marital misconduct in such proportions as the court deems just after considering all relevant factors including:

(1) The length of the marriage.

(2) Any prior marriage of either party.

(3) The age, health, station, amount and sources of income, vocational skills, employability, estate, liabilities and needs of each of the parties.

(4) The contribution by one party to the education, training, or increased earning power of the other party.

(5) The opportunity of each party for future acquisitions of capital assets and income.

(6) The sources of income of both parties, including but not limited to medical, retirement, insurance or other benefits.

(7) The contribution or dissipation of each party in the acquisition, preservation, depreciation or appreciation of the marital property, including the contribution of a party as homemaker.

(8) The value of the property set apart to each party.

(9) The standard of living of the parties established during the marriage.

(10) The economic circumstances of each party at the time the division of property is to become effective.

spread practice of using a fifty-fifty distribution of marital property as the starting point in marital distribution. By utilizing a semantic inversion, "starting point" without consideration of its defacto nature and effect, the legislative provisions have been subverted.

*Ruth v. Ruth,* 316 Pa.Super. 282, 462 A.2d 1351 (1983) correctly stated the law that there may be no guidelines established beyond those of the Divorce Code of 1980 in equitable distribution of marital property. There the court said:

> [A]t oral argument in this case, a suggestion was made by counsel for the parties that this Court adopt "guidelines" or establish "presumptions" to be applied in deciding issues involving property rights under the Code. In view of the legislative guidelines which are set out forthwith, we see no need for this Court to enumerate additional criteria. Rather, we will carefully scrutinize each of the guidelines in determining whether or not the lower court has abused its discretion. This will assure that our review of proceedings under the New Divorce Code be appropriately assiduous.

*Id.,* 316 Pa.Superior Ct. at 287, 462 A.2d at 1353.

In *LaBuda v. LaBuda,* 349 Pa.Super. 524, 503 A.2d 971 (1986), the court held that using a fifty-fifty starting point *in that case* was not improper in equitable distribution but then went on to say "We believe that the master gave more than adequate regard to these factors, (23 P.S. § 401(d)), in finding that, '[i]n order to attempt to recognize the health insurance and social security factors and effectuate economic justice' he recommended a 55/45 division of the property." *Id.,* 349 Pa.Superior Ct. at 539, 503 A.2d at 979. (Citations omitted) Thus the *LaBuda* Court distinguished *Ruth* in allowing for a consideration of a fifty-fifty starting point *but only after finding that all of the 401(d) factors had fully and properly been considered,* and affirming *Ruth* in that no presumptions apply other than the guidelines set forth in the Divorce Code, specifically stating "In any event, we are not establishing any presumptions or guidelines." *Id.,* 349 Pa.Superior Ct. at 530, 503 A.2d at

975. In light of our determination on the issue in *LaBuda*, and the specific holding in *Ruth*, we must look carefully at the development of case law and the remarks of some judges and writers concerning the fifty-fifty starting point. *Morschhauser v. Morschhauser*, 357 Pa.Super. 339, 516 A.2d 10 (1986) held *Ruth, supra*, rejected any presumptions or guidelines other than those permitted by the Divorce Code, hence a fifty-fifty starting point may not be applied in a presumptive fashion. *Ganong v. Ganong*, 353 Pa.Super. 483, 513 A.2d 1024 (1986) recognized that a fifty-fifty starting point may not be used as a presumption (is not an end in itself) but that 401(d) factors must be applied. To the extent that the fifty-fifty starting point, without more, or with nominal consideration of the 401(d) factors is applied, it is for evidentiary purposes an unacceptable presumption. The far better procedure is to avoid any reference to the fifty-fifty starting point and to go directly to the factors contained in the legislative guidelines pursuant to section 401(d). The reasons for avoiding such a starting point is already evident in that the fifty-fifty starting point is acquiring the weight of a presumption as demonstrated by the position taken by some lawyers, judges and writers.

The judicial butterfly, no matter how carefully it flutters down upon the flowers represented by the starting point of fifty-fifty distribution, comes away with the pollen of judicial precedent. This, through time and/or repetition, will become established as a rule, which is but another way of saying presumption. The basic position in Pennsylvania law as to presumption is stated by our Supreme Court in *Watkins v. Prudential Ins. Co.*, 315 Pa. 497, 504, 173 A. 644 (1934):

Presumptions arise as follows: they are either (1) a procedural expedient, or (2) a rule of proof production based upon the comparative availability of material evidence to the respective parties, or (3) a conclusion firmly based upon the generally known results of the wide human experience, or (4) a combination of (1) and (3).

*See Pennsylvania Trial Evidence Handbook*, Jenkins, Presumptions, Inferences and Related Doctrines § 2.1.

 The fifty-fifty starting point clearly fits (1), or (3) of the definition as it becomes systematically applied, and has added strength because it is a combination of both. In *Words and Phrases,* Permanent Edition 33 A (pp. 57–109), there are fifty-two pages of definitions having to do with presumptions and many of them would describe the analysis provided in *Paul W. v. Margaret W.,* 130 P.L.J. 6 (Ct.C.P. Allegheny County 1981), and other cases for using a fifty-fifty distribution as a starting point. While the court in *Paul W.* confesses an inability to evaluate the factors of 401(d) before fixing distribution and, therefore, must fall back upon a starting point of fifty-fifty distribution, this simply ignores the legislative mandate and adopts the *easiest* solution which, in keeping with human nature, will be the *only* solution. Once the fifty-fifty starting point is universal, lip service will be paid to equitable distribution and we will, in fact, if not in word, be distributing property in the manner of community property regimes and, in most respects, as done in partition, or as was the manner of proceeding prior to the 1980 Divorce Code. The Pennsylvania Supreme Court has declared community property laws unconstitutional; therefore, any distribution that is effected on the basis of similar considerations would be likewise unsupportable. To the extent that there is *an automatic bestowal* of the separate property of one spouse upon the other, as is the law in community property states, it is unconstitutional as a deprivation of property in violation of due process. *See Willcox v. Penn Mutual Life Insurance Co.,* 357 Pa. 581, 55 A.2d 521 (1947); *Everson v. Everson,* 494 Pa. 348, 431 A.2d 889 (1981); *Bacchetta v. Bacchetta,* 498 Pa. 227, 445 A.2d 1194 (1982). In Perlberger, *Pennsylvania Divorce Code,* 1980, § 5.2 The Concept of Equitable Distribution, it is stated: "[W]hile many factors go into the formula for post-divorce division, it is important to note that record ownership of assets remains significant and *the court must find that equity requires a transfer of ownership from one party to the other....*" (emphasis added) For this reason, to validly implement that section of the

Divorce Code, that all property coming into the marriage is presumed to be matrimonial property (section 401(f)), it is necessary to first consider, before determining each share, all factors enumerated in section 401(d) as well as other relevant factors, and thus equitably determine how much or how well each property became vested in each partner. Marital property is not property that is thrown into the pot to be divided equally as in community property states, but property impressed with equitable consideration which must be evaluated before apportionment is considered. Only in this manner can we avoid the constitutionality issue raised in *Willcox*. We cannot, therefore, approve a starting point of fifty-fifty *without* consideration of section 401(d) factors.[2] This would presume a vesting of a fifty percent share in each partner, which would constitute an improper transfer of separate property, without due process. When a fifty-fifty starting point is utilized, this Court will scrutinize that process very carefully to determine whether the lower court proceeded in a presumptive fashion or properly and fully considered all 401(d) factors before making distribution. The presumption that all property coming into the marriage is matrimonial property is not equivalent to the creation of entireties property, which requires that the property be acquired in joint names of husband and wife. Matrimonial property, by definition, applies only for purposes of chapter IV of the Divorce Code, *when* equitable distribution is claimed. A subsequent redivision would be a

**2.** Pennsylvania has not adopted the Uniform Marital Property Act, approved during 1983 by the National Conference of Commissioners on Uniform State Laws. The Act would confirm *ownership* of the marital property at the time of divorce, requiring reallocation of the property derived from the efforts of both spouses during the marriage, *starting* from a *basis of equal undivided ownership* that the spouses share in their marital property. Distribution would be according to the appropriate procedures for dividing property in the several states. *See Wadlington, Domestic Relations Cases and Materials,* Second Edition, Foundation Press, 1984, pp. 243–246. Without legislative consideration and passage of the Uniform Act, we are unable to adopt this approach. *Equal undivided* share is community property in nature whereas Pennsylvania adheres to common law principles which hold that property held by husband and wife is not by moieties but each having an entirety of interest.

further transfer of property from one to the other thus requiring two property adjustments, both presenting constitutional problems. If, after due consideration, there is an equal distribution, it is *because* of the application of those and other relevant factors and not because section 401(d) factors did not apply as indicated by the lower court. The analysis prescribed by section 401(d) supplies the due process required by *Willcox.*

In a recent Supreme Court decision, *Duff v. Duff,* 510 Pa. 251, 507 A.2d 371 (1986), in reversing the Superior Court and holding that an additional tax assessment on a tax liability should be considered a joint liability of the marital estate, the Court, in a footnote and speaking through McDermott, J., stated:

> We remand this case in order to allow the trial court to re-evaluate the equitable distribution of the Rorer stock, taking into consideration the joint liability of the tax assessment, penalties and interest, and the circumstances surrounding the accrual of such assessment, penalties and interest. We make no recommendation as to how this division should be made.

*Id.,* 510 Pa. at 254, n. 4, 507 A.2d at 373, n. 4. This is a strong indication of how critical the need is for the trial court to undertake such a nonpresumptive approach in ascertaining equitable distribution. The legislature clearly intended an equitable distribution and, aside from the issue of constitutionality, the bias, which is created by using a fifty-fifty distribution as a starting point, places too heavy a burden on the party, who deserves better, to work away from that fixed point, to establish what is equitable as compared to what is equal. While the judge must make that determination, the parties must establish the factual basis to do so. The effect of any presumption is to cast the burden of going forward with the proof on the opposing party. It also eliminates to some degree the desire of the trial judge to use his discretion to make an equitable distribution when the decision is a hard one. This is apparent as the fifty-fifty starting point in distribution is becoming increasingly common and with the misapplication of

*LaBuda* getting widespread circulation, *equal distribution* will be the rule and *equitable distribution,* the exception. Indicative of this are the statements of the trial court quoted in *Sergi v. Sergi,* 351 Pa.Super. 588, 506 A.2d 928 (1986):

Based upon these factors, the Court would be hard pressed to find any reason to deviate from *the standard which is generally followed, which is that an equal distribution will generally be equitable.* And we would make such a finding in this particular case. (emphasis added)

*Id.,* 351 Pa.Superior Ct. at 598, 506 A.2d at 934, quoting R.R. 233–234.

The trial judge's Opinion is also quoted as follows:

Prior to distributing the marital property, the trial court indicated *'that an equal distribution would be used as a starting point, and thereafter* the factors provided under Section 401 D (sic) of the divorce code would be applied to determine if there should be any deviation from the recommended initial distribution of 50–50.' (R.R. 232). (emphasis added)

*Id.,* 351 Pa.Superior Ct. at 597, 506 A.2d at 933.

Finally,

Suppose at separation in 1975, Husband and Wife own both Blackacre and Whiteacre, each worth $100,000.00. At the date of trial in 1982, Whiteacre is worth $50,000.00 but Blackacre has increased in valued to $300,000.00. If date of separation values were used, *I could award Blackacre to one party and Whiteacre to the other on a 50–50 split.* Yet Blackacre is today worth six times what Whiteacre is worth. (footnote omitted)

*Id.,* 351 Pa.Superior Ct. at 593, 506 A.2d at 931.

Without question, the lower court, in *Sergi,* approves a presumption of equal distribution which is not permitted by the Divorce Code. No more convincing evidence of the ascendency of the presumptive nature of that consideration is the statement in the 1985 Supplement to Perlberger's *Pennsylvania Divorce Code,* § 5.2 The Concept of Eq-

uitable Distribution: "Most lower courts have followed the lead of the Court of Common Pleas of Allegheny County which first held that the most convenient starting point for equitable distribution is an equal division of marital property." If we needed any further evidence that this policy has reached the point of presumption, this Court has now received a petition for reargument which alleges error by the panel in *failing* to use as a starting point fifty-fifty division of property in its consideration, *Dinello v. Dinello,* No. 1582 Pittsburgh, 1985. Similarly, in *Morschhauser, supra,* petitioner claimed error by the panel in failing to apply the "presumption" of a fifty-fifty starting point in equitable distribution. It would appear that despite *LaBuda's* statement to the contrary, that there is no presumption by applying a fifty-fifty starting point, legal writers, judges and lawyers throughout the Commonwealth say there is. If *LaBuda* is not in conflict with *Ruth,* then *LaBuda* is being misinterpreted; if it is in conflict with *Ruth* and has established a presumption, when *Ruth* correctly held that no presumption is permissible, it cannot stand, as a later panel, under the Internal Operating Procedures of the Superior Court, cannot overrule the published finding of an earlier panel. We hold *LaBuda* not to be in conflict with *Ruth* and that a fifty-fifty starting point may not be applied in a presumptive fashion, and when applied, will be closely scrutinized to determine if equitable distribution can be justified under the section 401(d) guidelines.

In keeping with the above discussion, the proper rationale to be applied is clearly detailed in the Divorce Code (23 P.S. § 101 et seq.). Looking first to section 102, Legislative findings and intent, subsection (a)(6) provides:

(6) Effectuate economic justice between parties who are divorced or separated and grant or withhold alimony according to the actual need and ability to pay of the parties and insure a fair and just determination and settlement of their property rights.

Section 103, Construction, provides:

The provisions of this Act, *so far as they are the same as those of existing laws,* are intended as a continuation

of such laws and not as new enactments. (emphasis added)

Since a specific provision, infra, requires that distribution be equitable and not equal, and prior law required partition and equal division of jointly owned property,[3] with retention of separate property, it is absolutely certain that we are not to construe this section as a continuation of prior law (as is the case if equitable distribution was *not* requested pursuant to section 401(d)) and, therefore, not being a continuation of existing laws, there is no legal basis to use as a starting point "equal"[4] distribution. A starting point of fifty-fifty distribution is superfluous to this process.

Turning to section 401(d), the clear statement of the law is that the court will equitably distribute or assign marital property (which is determined pursuant to section 401(e)) *"[A]fter considering all relevant factors including...."* (emphasis added), and then lists ten factors. The starting point is unequivocally the consideration of all relevant factors. This requires compilation, computation, weighing and balancing considerations, and then applying the sound discretion of the court to achieve economic justice. *See Duff, supra.* This is more difficult than beginning (and likely ending with minor variation) at a fifty-fifty starting point. It is, however, no more difficult than in other areas of domestic relations where the legislature and our courts have rejected presumptions such as shared custody, the tender years doctrine or arbitrary support levels for wife or children. If we have indeed created a presumption by the process discussed above, then every case must begin with that consideration and those which do not are in error (*see* Petitions for reargument as filed in *Dinello* and *Morschhauser, supra*). If no presumption exists, (of fifty-fifty

3. 68 P.S. § 501. Divorced tenants by entireties hold, as tenants in common; suit for sale and division of proceeds.

4. To assume fair and just is "equal", flys in the face of the heavy debate in creating this section of the Code, as the prior approach was "equal" and not "equitable", as to division of jointly held property.

distribution) starting at that point is unnecessary and probably undesirable as it triggers an immediate and intense inquiry as to whether such a presumption was in fact applied.

Bearing these considerations in mind, among the relevant factors that must first be considered in this case are the length of marriage (four and one-half years before separation—nineteen years defacto); prior marriage of wife; age, husband, fifty years and wife, fifty-three years; good health for both; source of income, husband, salesman—family business, average income above $18,000 per year, wife, $12,000 per year; employability (continuing as is) liabilities; the contribution or dissipation of each party in the acquisition, preservation, depreciation or appreciation of the marital property; the value of the property set aside to each party; economic circumstances of each party at the time the division of property is to become effective.

In addition, the court was required to consider the effect of the property division on the need for alimony under section 501.

We have no quarrel with the assessment of the court of those factors it did consider, but we do believe he committed reversible error in not applying those factors at the outset and in considering others "diversionary."

Applying the frequently pronounced standard for the scope of appellate review, the abuse of discretion standard, we are not to usurp the trial court's duty as finder of fact. Rather, we will carefully scrutinize each of the guidelines in determining whether or not the lower court has abused its discretion. *Ruth, supra; Gee v. Gee,* 314 Pa.Super. 31, 460 A.2d 358 (1983).

Returning to the guidelines, the court found that the wife, at time of marriage (she was 34, he was 31), brought assets into the marriage of $2,500; husband, none. A lot was purchased on which the marital home was built, using wife's inheritance and acquiring a loan borrowed against

the wife's passbook savings ($1,500). Between 1965 and 1966, the house was built using a construction loan of $22,500, the husband testifying that an additional $10,000 of marital funds were used for this purpose. The husband also provided in-kind work toward its construction and through his contacts, much of the construction occurred at below market cost. Subsequent to the separation in 1968, the husband's contributions to maintaining the house, paying off the mortgage and preserving its equity, were nil, and in order to avoid foreclosures in 1972, the wife was required to borrow money from her family to pay the delinquency (Slip Op. pp. 2–3). In addition, Orders for support and alimony pendente lite had been obtained by her against the husband, which went unpaid, and only after an agreement was made to apply those payments to taxes on the property in 1974, did he comply with the order (Slip Op. p. 8). The sum and substance of these facts leads to the conclusion that but for the in-kind contribution estimated at $9,000 by the husband, the purchase of the lot, payment of the mortgage, property maintenance and protection from foreclosure, were primarily through the efforts and sacrifice of the wife with the assistance of her family. The court concluded as much (Slip Op. pp. 2 and 8) in its analysis of the acquisition and preservation of the property. If without more, the court considered the above factors in relation to section 401(d)(7), the contribution or dissipation of each party in the acquisition, preservation, depreciation or appreciation of the marital property, it would be hard pressed, in equity, to find the husband was entitled to any but a token share of the marital home which is the only significant property.

The payment of the taxes in lieu of alimony cannot be an offset to the major contribution of the wife in preserving the property. Had he not paid the alimony, the wife would have had the right to reduce the arrears to judgment and thereafter apply the judgment as a lien

against the husband's share of the real estate, thereby absorbing his share, if any. *See* 48 P.S. § 132–§ 136.

In addition to application of section 401(d)(7) to this computation, consideration must be given to the relative standard of living of the parties throughout the intervening years during which the property was acquired. The record and the lower court Opinion establish that the husband was doing very well whereas the wife was struggling. The wife may have had better housing, but she was paying for it, as well as maintaining a daughter, on what was at best a borderline salary. On the other hand, the husband, as a member of a closely held corporation, had a salary exceeding $18,000, other income from interest-free loans which generated $11,000 + income yearly, free housing, use of company vehicles and other perquisites. His perquisites greatly increased his standard of living over his salary. He was also able to accumulate investments and IRA retirement benefits which provide additional security for him. This must be balanced against the wife's struggle to maintain herself and the house. To award the husband a substantial share of that property, to which he did not contribute in any major way, while he had substantial means to do so, is inequitable. By considering these matters "diversionary", the trial court ignored the mandate of the statute, and having in the forefront the fifty-fifty starting point, was lulled into remaining with that basis for distribution. It is this factor that clearly delineates equitable distribution from the common law distribution of marital property; the discretion to deviate from common law distribution must be exercised in the proper case, if it is to be equitable. We, therefore, hold the lower court was in error in awarding any share in the residence to the husband.

The second issue raised by appellant has to do with marital assets, aside from the residence at 987 Clifton Road, which may or may not have been acquired during the marriage. While the husband testified during the hearing

that he had virtually no assets at the inception of the marriage and that at the time of the hearing the firm was on the verge of liquidation, and the trial court acknowledged that "games" and "business shenanigans" (Slip Op. at 6) took place with the husband's corporation, the court failed to look closely at the evidence presented concerning that operation and to evaluate its effect on the total award. Perhaps lulled by the presumptive application of a fifty-fifty starting point, the trial court saw no need to do more than look to the gross marital asset available and proceed from that point in making an award. Our review of the record indicates there were substantial assets acquired during the marriage but primarily after the date of separation in 1969. The 1980 Divorce Code provides:

§ 401(e)(4)

(e) For purposes of this chapter only, "marital property" means all property acquired by either party during the marriage except:

(1) Property acquired in exchange for property acquired prior to the marriage except for the increase in value during the marriage.

(2) Property excluded by valid agreement of the parties entered into before, during or after the marriage.

(3) Property acquired by gift, bequest, devise or descent except for the increase in value during the marriage.

(4) *Property acquired after separation until the date of divorce,* provided however, if the parties separate and reconcile, all property acquired subsequent to the final separation until their divorce. (emphasis added)

While we acknowledge that the wife's savings, totalling $13,000, was in some measure advanced to the husband for his business, we take this into consideration in balancing out the contribution in purchasing the residence and paying taxes on the residence in later years. Additionally, we

cannot trace this asset as there is the presumption of a gift between spouses when one or the other contributes money to a joint account or to the business of the other. *Butler v. Butler,* 464 Pa. 522, 347 A.2d 477 (1975).

Issue three, concerning a requirement that the appellant pay the husband's share of the value of the marital residence, with interest should husband's share not be paid in sixty (60) days, is rendered moot by our finding as to the proper distribution of marital property.

██ The final issue pertains to the failure of the court to specify its reasons for failing to award alimony and counsel fees.

The Divorce Code of 1980, 23 P.S. § 501(d), provides:

(d) In an order made under this section the court shall set forth the reason or reasons for its denial or award of alimony and the amount thereof.

Appellant is correct in alleging the trial court failed to comply with the requirement of this section.

As a result, we are unable to determine the basis for the lower court's decision and thus are deprived of the ability to conduct an appropriate review as required by the rules of appellate procedure.

Pa.R.A.P. 1926 states in part:

If any difference arises as to whether the record truly discloses what occurred in the lower court, the difference shall be submitted to and settled by that court after notice to the parties and opportunity for objection, and the record made to conform to the truth. *If anything material to either party is omitted from the record by error or accident or is misstated therein, the parties by stipulation, or the lower court either before or after the record is transmitted to the appellate court, or the appellate court, on proper suggestion or of its own initiative, may direct that the omission or misstatement be corrected, and if necessary that a supplemen-*

*tal record be certified and transmitted.* (emphasis added)

"Where it is impossible for the appellate court to decide a case because the record is incomplete, the case should be remanded to the lower court for clarification and completion of the record." *Johnson v. Keystone Insurance Company,* 299 Pa.Super. 187, 193, 445 A.2d 517, 520 (1982) (remand necessary when record contains neither a transcript of a master's hearing nor a master's report and parties disagree as to what evidence was actually presented at the hearing, and trial court's Opinion has no findings of fact which documents not properly before us can be considered by the lower court). 42 Pa.C.S.A. § 706 provides:

**§ 706. Disposition of appeals**

An appellate court may affirm, modify, vacate, set aside or reverse any order brought before it for review, and may remand the matter and direct the entry of such appropriate order, or require such further proceedings to be had as may be just under the circumstances.

For the above reason, on the issue of alimony and counsel fees, the case must be remanded. We would note, however, that post-divorce alimony is primarily rehabilitative and based on need. Considering the length of the time the parties lived together and the wife's present employment status, and our findings on the distribution of the residence, her claim for alimony, when tested against the factors linked in section 501 Alimony, will be hard to justify. The request for counsel fees and costs, however, have much greater merit.

It is, therefore, ordered that the decree be vacated as to the distribution of the residential property and that property in its entirety be awarded to the wife; the award as to distribution of all other alleged marital property is affirmed; the case is remanded for findings as to alimony and counsel fees.

Jurisdiction relinquished.