## Cribbs Estate.

Argued March 22, 1963. Before BELL, C. J., MUS-MANNO, JONES, COHEN, EAGEN, O'BRIEN and ROBERTS, JJ.

*John H. Bozic, Jr.,* with him *H. Ray Pope, Jr.,* and *Bozic & Bozic,* for appellants.

No argument was made nor brief submitted for appellee.

OPINION BY MR. JUSTICE ROBERTS, June 4, 1963:

Decedent died intestate December 15, 1956 (as a result of an explosion in his machine shop), survived by his widow and three adult sons [appellants] of a prior marriage.[1] Letters of administration were granted to his widow [appellee] six days later, and on October 24, 1960, she filed her final account. Appellants filed exceptions to the account, which exceptions were heard and dismissed by the auditor. It is from the court's dismissal of exceptions to the auditor's report that this appeal is taken.[2]

---

[1] Decedent's first wife and mother of appellants died in June, 1940; he remarried in 1945, and that marriage continued until his death.

[2] We had the benefit of neither oral argument nor brief in behalf of appellee.

The facts from which this controversy arises are not in dispute. For many years prior to 1945, decedent had been employed in a machine shop. At about the time of his remarriage in 1945, he bought the shop for $1,000, and continued the business as "Cribbs Machine Company." The purchase price was provided by his wife who withdrew the funds from her teacher's retirement accumulation. In November, 1945, with $300 supplied by his wife's sister, a bank checking account was opened, "Cribbs Machine Company, Paul Cribbs, Mrs. Paul Cribbs."[3] The signature card, ledger cards and bank pass book contained no other language, designation or indication of the ownership or rights in the bank account.[4] Both decedent and his wife drew checks on the account which was their only bank account. At decedent's death there remained a balance of $1,979.05.

In 1946, a lot was purchased and titled in decedent's name alone. Later, a dwelling was erected on it for use by decedent and his wife. On December 29, 1950, decedent and his wife executed a $15,000 mortgage on this property as security for a bank loan for the construction of a machine shop to the rear of their dwelling.

---

[3] This title appeared on the passbook issued by the bank.

[4] The signature card appears as follows:

"Authorized signature of            Individual
    Cribbs Machine Co.
For the First National Bank, New Bethlehem, Pa.
Address        New Bethlehem, Pa.

*     *     *

Signature      Paul Cribbs
Signature      Mrs. Paul Cribbs
Remarks .................... Date 11/27/45."

In addition to what is here shown, the signature card contained a paragraph dealing with the bank's liability in receiving items for deposit and collection, without reference to the ownership of the account.

246

The mortgage was recorded on January 4, 1951, and on that day the bank advanced the funds.

On December 21, 1950, decedent applied for three life insurance policies, each in the amount of $5,000, with his wife as beneficiary, and the policies were issued on January 2, 1951. Later, on January 11, the decedent as the insured and his wife as beneficiary assigned the three policies to the bank as collateral for the loan.[5] When the balance due on the bank loan was reduced to $10,000, decedent cancelled one of the policies. At his death, two policies totalling $10,000 were in effect, and the principal balance owing on the mortgage was $8,700.

Shortly after decedent's death, the insurance carrier forwarded its draft for $10,000 to the bank, payable to the bank as assignee and to the widow as beneficiary. The bank retained the draft for more than a year until February 6, 1958, when the mortgage debt and interest, then totalling $9,299.18, was paid from assets of the estate.[6] The bank then endorsed the draft and surrendered it to the widow-beneficiary.

---

[5] With regard to assignments thereof, the insurance policies provided inter alia: "The Owner may assign this policy and all rights hereunder except the right to change the beneficiary. . . . An assignment by the Owner, so long as it remains in force, shall exclude any and all rights of any other person referred to in this policy, except that if this policy is assigned or pledged as collateral only, any equity remaining at the maturity of this policy shall accrue to the person or persons who, had there been no assignment then outstanding, would have been entitled to the amount then payable. *Upon release of all outstanding assignments* or upon reassignment to the Owner, *the respective rights of the several persons referred to in this policy shall be as then stated in this policy.*" (Emphasis supplied.)

[6] The sale of the machine shop building brought $6,000, which administratrix turned over directly to the bank; the remaining $3,299.18 was withdrawn from the estate bank account.

It is from this factual setting that appellants' dissatisfaction with the administration of the estate arises, and they assert three main objections: (1) the proceeds of the life insurance policies, rather than assets of the estate, should have been used to satisfy the mortgage loan; (2) the funds in "Cribbs Machine Company" bank account represented decedent's individual property and were estate assets; and (3) the widow-accountant should be surcharged for the delay in settling the estate and making distribution.

The validity of appellant's first contention, that the mortgage balance should have been paid from the life insurance proceeds, depends upon the insured-decedent's intention. It is his intention which conclusively determines whether the mortgage debt should have been paid out of the insurance proceeds or from the general assets of his estate. *Miller Estate,* 402 Pa. 140, 166 A. 2d 10 (1960).

The auditor found, and the court below agreed, that "the bank loan was made on the credit of the real estate mortgage, the mortgage having been made and the money advanced prior to the assignment of the life insurance policies, and the bank had the right to collect from the primary security." The lower court, in finding that decedent intended that the mortgage held by the bank "be primarily liable" for the repayment of the bank loan said: "We cannot in this respect, over-look the fact that the mortgage was taken to build the machine shop and in equity the proceeds from the machine shop should be used to pay its debt. We find the insurance policy to have been taken for the protection and benefit of the wife beneficiary."

The finding of the court below on this issue is amply supported by the record. The bank loan was decedent's debt. He, alone, was the record owner of the mortgaged premises. However, since his wife was obliged to sign the mortgage and bond, the decedent

secured the insurance primarily to protect her against liability to the bank in the event that at his death his general estate should be insufficient to satisfy the mortgage. If the estate were sufficient, she was to receive the proceeds of the policies. This was his initial intention when he designated her as his beneficiary, and it remained his intention, unchanged, until his death. The installment payments made on the mortgage, which reduced the principal debt, and his termination then of one of the policies is further evidence of his intention to protect her by what he apparently considered a reasonable amount of insurance on his life.

The mortgage loan was made to decedent prior to the assignments of the policies for the improvement of his individually owned realty and the benefit of his estate. At his death, the unpaid mortgage was his debt and properly recoverable from the proceeds of the mortgaged property itself, the direct security for the loan, or from the general assets of his estate. Here, as in *Miller,* supra, the life insurance policies, secured for the benefit of decedent's wife, were assigned merely as collateral security.

Appellants strongly rely on the language of the assignment provisions in the policies[7] to support their position. In light of the facts and circumstances here presented,[8] we do not agree with this contention.

The result reached by the court below may be supported also by the release provisions in the policies and assignments. The bank, in looking to sources other than the insurance proceeds and in surrendering the insurance draft to the beneficiary, voluntarily surrendered and released its rights under the assignments.

---

[7] See note 5 supra.

[8] These include the wife's financial contributions and other help, her execution of the bond and mortgage, the advancement of funds by the bank before the assignments of the policies as collateral, and installment payments by decedent.

Therefore, the designated beneficiary is entitled to the proceeds of the policies.

Appellants urge that the balance in the Cribbs Machine Company bank account was the sole property of decedent and an asset of his estate. The court below held that the account was in the name of husband and wife and was, therefore, subject to the legal presumption that it was held by the entireties. Appellants explain the name of Mrs. Paul Cribbs on the signature card as merely evidence of her authority to sign checks on the account of another. The record, however, fails to support that view. The account is not, as appellants contend, "Cribbs Machine Company" but rather "Cribbs Machine Company, Paul Cribbs, Mrs. Paul Cribbs." Recognition may not be given only to the fictitious name portion of the account while disregarding the rest of the account name. There is nothing to show that the designation "Mrs. Paul Cribbs" appears in the account in the limited capacity appellants assert. The account was opened in 1945 with funds provided by her sister; Mrs. Cribbs' name has always been part of the account, and she and her husband each drew checks on its funds. Furthermore, this was the only bank account which she and her husband had during his lifetime, and it would appear from the record that over the years it was used by both of them as their personal checking account. Nothing appears to suggest that it was used solely or even primarily as a business facility.

It is well established in Pennsylvania that a bank account in the names of husband and wife is presumptively an estate by the entireties. See, e.g., *Berkowitz's Estate*, 344 Pa. 481, 26 A. 2d 296 (1942); *Geist v. Robinson*, 332 Pa. 44, 1 A. 2d 153 (1938). The intention to create such an account " 'is assumed from the deposit in both names and from the fact of marital relationship.' " *Berkowitz's Estate*, supra, 483, A. 2d at

297. Estates by the entireties in bank accounts have been sustained where the funds were exclusively those of the husband, where the wife never executed a signature card or made any withdrawals or exercised any other control over the account, and where no agreement between the spouses was shown to exist. See *Berkowitz's Estate,* supra; *Geist v. Robinson,* supra. Here, as already pointed out, the facts much more strongly support a tenancy by the entireties. The effect of the instant factual situation is not overcome nor is the legal presumption of the entirety rebutted by a fictitious name identification preceding the names of decedent and his wife.

Appellants' final contention is that the widow-administratrix is subject to surcharge at 6% per annum on gross assets for her delay in the administration of this "relatively simple estate" and for her failure to make distribution within a reasonable time of decedent's death. It is argued that the court below erred in failing to impose interest under §754 of the Fiduciaries Act of 1949 which provides: "A personal representative who has committed a breach of duty with respect to estate assets shall, in the discretion of the court, be liable for interest, not exceeding the legal rate on such assets."[9]

The Act makes it unmistakably clear that the court is given discretion to fix or deny liability for interest. We are unable to conclude from review of the record that the court below abused its discretion in refusing to surcharge the fiduciary and to impose liability for interest.

Decree affirmed. Costs to be paid by the estate.

Mr. Justice BENJAMIN R. JONES and Mr. Justice COHEN dissent.

---

[9] Act of April 18, 1949, P.L. 512, Art. VII, §754, 20 P.S. §320.754 (1950).