**In re John and Carol DiPIETRO, Debtors.**

**Bankruptcy No. 91–13683S.**

United States Bankruptcy Court, E.D. Pennsylvania.

Jan. 28, 1992.

---

John J. Sellinger, Mattioni, Mattioni & Mattioni, Ltd., Philadelphia, Pa., for debtors.

Mark D. Mungello, Kraft & Kraft, P.C., Philadelphia, Pa., for Continental Bank.

Joseph DiGiuseppe, Asst. City Sol., Law Dept., Enforcement Div., Philadelphia, Pa., for City of Philadelphia.

Edward Sparkman, Philadelphia, Pa., trustee.

## MEMORANDUM

DAVID A. SCHOLL, Bankruptcy Judge.

JOHN DiPIETRO ("the Husband") and CAROL DiPIETRO ("the Wife") (collectively "the Debtors") filed a joint Chapter 13 bankruptcy case on July 3, 1991. Prior to their initially-scheduled confirmation hearing on December 10, 1991, they filed, on November 26, 1991, and have vigorously prosecuted, several Objections to proofs of claim filed in their case.

Pursuant to one of these Objections, a secured claim in the amount of $716.48 of Canadian's Credit Plan arising from family clothes purchases was reclassified from secured to unsecured after a hearing of January 7, 1992. At this hearing, attended only by the Wife, we sustained the Objection because we noted that the documents attached to the claim provided a purported purchase-money security interest only to Hurley State Bank, a non-claimant. *See e.g., In re Allegheny Int'l, Inc.,* 954 F.2d 167, 173–74 (3d Cir. January 21, 1992); and *In re Lewis,* 80 B.R. 39, 40–41 (Bankr.

E.D.Pa.1987) (the objector's production of evidence sufficient to overcome the presumed validity of claim requires the claimant to prove its claim by a preponderance of the evidence).

The Debtors also objected to two claims of the City of Philadelphia and the School District of Philadelphia, both asserting priority claims, of $31,768.53 and $30,168.25, respectively. After a lengthy hearing of January 23, 1992, which generated considerable conflicting documentation, we allowed the parties until February 24, 1992, and March 2, 1992, to simultaneously submit opening and reply submissions, respectively, in support of their positions on this matter.

On January 23, 1992, we also heard the Debtors' multi-faceted Objections, as amended, to a secured proof of claim (Claim No. 2) filed by Continental Bank ("the Bank") in the amount of $15,321.51. We must, however, reject all of these Objections, for the reasons stated.

The Debtors' obligations to the Bank arose out of a series of loans through which the Debtors financed the establishment of a tailor shop of which the Husband was the principal, located in the Bourse Building in Philadelphia. The first loan in the series was made on October 31, 1984. On that date, both the Husband and the Wife, the latter of whom did the bookkeeping and worked on custom shirts in the tailor shop, executed a Mortgage on their jointly-owned residential realty and a Power to Pledge all of their assets to the Bank in the amount of $15,000. The Husband alone then executed a series of Non–Discount Notes, in the form of demand notes ("the Demand Notes"), for various cumulative sums advanced, as of the respective loan dates (October 31, 1984—$3,500; November 12, 1984—$6,000; November 30, 1984—$8,500; December 10, 1984—$13,000; January 14, 1985—$17,000). Also executed on October 31, 1984, was a statement of the Husband certifying that the proceeds were to be used for working capital in the tailor business.

On February 4, 1985, a new Mortgage in the amount of $30,000 was executed by the

Debtors. The Husband alone executed further Demand Notes in the Amounts of $19,500 and $25,000 on February 12, 1985, and June 26, 1985, respectively.

On May 7, 1987, both Debtors acceded to the Bank's request to recast the previous series of loans by executing a Commercial Term Note ("the Term Note") in the Bank's favor in the amount of $29,429.40. It is not clear whether any "new money" was given to the Debtors at this time. Unrebutted testimony of Thomas Bilotta ("Bilotta"), a Bank officer who handled this loan, recited that, at the time of the execution of the Term Note, the balance due on the demand notes was about $22,000, and the Term Note balance was computed by adding discounted interest at the rate of twelve (12%) percent per annum to this amount, projected to be repaid in 60 installments of $490.49. The Debtors made significant payments on this obligation, but ultimately fell into arrears and were allowed to make payments of $400 monthly. No dispute regarding calculation of the specific balance due asserted by the Bank in the claim was raised by the Debtors. Rather, their Objections were concentrated on ingenious assertions that the loan transactions were violative of various federal and state laws.

Much of the Debtor's energies were directed towards a contention that the requirement that the Wife sign the Term Note violated provisions of the Equal Credit Opportunity Act, 15 U.S.C. § 1691, *et seq.* ("the ECOA"), Specifically, they alleged a violation of those provisions of the ECOA which prohibit a creditor from taking the "sex or marital status" of a borrower "into account in connection with the evaluation of the creditworthiness of any applicant," 15 U.S.C. § 1691d(a), and, more particularly, the following provision of Regulation B, 12 C.F.R. § 202.7(d)(1):

(d) *Signature of spouse or other person—(1) Rule for qualified applicant.* Except as provided in this paragraph, a creditor shall not require the signature of an applicant's spouse or other person, other than a joint applicant, on any credit instrument if the applicant qualifies under the creditor's standards of creditworthiness for the amount and terms of the credit requested.

The Debtors argued that, in light of the security in the Debtors' joint assets arising from the Mortgages and the Power to Pledge, the Husband would have qualified for the Term Note without the Wife's signature, and therefore the Bank's requiring her participation as a signatory on the Term Note violated these provisions.

Bilotta testified that the Bank would not have made any of the loans in issue unless the Wife signed all of the documents which the Husband and/or the Debtors executed. He explained that the Husband individually had no assets and that he believed that the Wife's execution of the Term Note was necessary to secure not only the real estate, which was already secured by the Mortgages, but all of the other assets owned by the Debtors personally and in the tailoring business, since the latter was their individual proprietorship. The Wife, on her part, admitted that she always considered the obligations to the Bank to be the Debtors' joint obligations.

▮ The espoused purpose of 15 U.S.C. § 1691d(a) and 12 C.F.R. § 202.7(d) was to eliminate credit discrimination against married women, who traditionally had been required to obtain their husbands' joinder to any credit applications. *See United States v. ITT Consumer Finance Corp.,* 816 F.2d 487, 489 (9th Cir.1987); and *Cragin v. First Federal Savings & Loan Ass'n,* 498 F.Supp. 379, 382–83 (D.Nev. 1980). These cases establish that the issue of whether the creditor actually needed the joinder of the spouse of a principal borrower in a loan transaction is analyzed under applicable state law. *ITT, supra,* 816 F.2d at 490–92. The burden of proof in an ECOA case is similar to that in any other type of discrimination case. *Cragin, supra,* 498 F.Supp. at 384. If the claimant makes out a *prima facie* case by showing that that party is a member of a class protected by the law preventing discrimination, the burden shifts to the creditor to establish a non-discriminatory basis for its actions. *See, e.g., McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–03, 93 S.Ct. 1817, 1824–25, 36 L.Ed.2d 668 (1973); *EEOC v. Metal Service Co.,* 892 F.2d 341, 347–48 (3d Cir.1990); *Cragin, supra,* 498 F.Supp. at 384; and *In re Metro Transpor-*

*tation Co.,* 64 B.R. 968, 975–76 (Bankr. E.D.Pa.1986).

■ Although the instant facts do not track those situations which the law and the Regulation in issue were intended to rectify, *i.e.,* the primary applicant is the Husband, not the Wife, and there is no issue about the necessity of the Husband's signing the loan documents in issue, we find that a *prima facie* case of discrimination has been made out. The Wife is the spouse of (arguably) the primary borrower and her signature to the Term Note was admittedly required.

■ However, we also conclude that Bilotta's explanation for the Bank's actions satisfies the burdens of justifying its actions. The Husband presented no evidence that he owned any individual assets. Under applicable Pennsylvania law, the Bank could obtain security in not only the Debtors' home, but also their other property, only by having the Wife be a co-obligor on the loan. The tailor business and all of the Debtors' other personal property, was owned by both of the Debtors and, as such, was presumptively entireties' property. *See, e.g., In re Garafano,* 99 B.R. 624, 634 (Bankr.E.D.Pa.1989); and *Shapiro v. Shapiro,* 424 Pa. 120, 136, 224 A.2d 164, 172 (1966). Unless both parties signed, the Debtors' business and other personal property could not have been reached by the Bank upon default in payment on the loans. *Id.* We therefore find credible Bilotta's contention that the Bank would not have continued to advance funds to the Debtors or have foreborn foreclosure on the Demand Notes unless the Wife signed the Term Note.

It is not totally clear why the Bank did not require the Wife to sign the series of Demand Notes, as well as the Term Note. However, since the Power to Pledge was only in the amount of $15,000, it was logical for the Bank to insist on documentation which would extend its security to the Debtors' personal assets, including those in the business, as well as their realty, for the continued extension of such sizable advances. We therefore conclude that the Bank has proven that it logically required the Wife's signature on the Term Note as a condition of the creditworthiness of the loan applicants, and that an application on the part of the Husband alone would have been denied by the Bank for lack of creditworthiness. *Compare ITT, supra* (proof of justification in requiring the Wife's signature to loan of a husband negates an EOCA claim).

■ The Debtors also claim that the Bank failed to provide the disclosures and notices of their rights to rescind the transactions in issue required by the federal Truth-in-Lending Act, 15 U.S.C. § 1601, *et seq.* ("the TILA"). However, the loans in issue clearly involve "extension of credit primarily for business, ... purposes, ..." to which the TILA does not apply. 15 U.S.C. § 1605(a).

■ In their Objections, the Debtors also make reference to the Real Estate Settlement Procedures Act, 12 U.S.C. § 2601, *et seq.* ("RESPA"). However, the application of RESPA is confined to home-purchase transactions, which excludes the instant loans. *See* 24 C.F.R. § 3500.5(d)(2); and *In re Russell,* 72 B.R. 855, 873 (Bankr.E.D.Pa. 1987).

■ Also plainly lacking merit is a contention, articulated rather vaguely at the hearing, that it was in some way improper for the Bank, on October 31, 1984, to take a Mortgage covering largely future advances, citing *Western PA. Nat'l Bank v. Peoples Union Bank & Trust Co.,* 439 Pa. 304, 266 A.2d 773 (1970), as authority for establishing that such a practice was improper. There are several quick responses to this apparent argument. The issue in *Western PA.* was whether a creditor whose claims included post-mortgage advances secured by a mortgage which did not contain a future advance clause had priority over a subsequent mortgagee unaware of the parties' agreement to allow the mortgage to attach to future advances. *Id.,* 439 Pa. at 306–07, 266 A.2d at 775. However, the instant mortgage *contains* a future advance clause. Furthermore, the Debtors, as parties to the mortgage and its extension as security for future advances, cannot attack such defects unless they are alleging a right to stand in the shoes of the trustee, *see In re Morrison,* 69 B.R. 586, 590 (Bankr.E.D.Pa.1987), which they are

not. *But see id.* at 590–92 (junior creditor which no longer has a valid loan cannot attack the validity of the extension of a mortgage to future advances).

■ Finally, the Debtors raise several claims under the Pennsylvania Loan Law, commonly referred to as Act 6 of 1974, 41 P.S. § 101, *et seq.* ("Act 6"). The first category of the Debtors' claims under Act 6, based upon the Bank's charging allegedly usurious interest slightly in excess of that allowed under 41 P.S. §§ 301(d)–(e) of the Act, plainly lacks merit. Although certain provisions of Act 6 appear to apply to the transaction, most notably the pre-acceleration notice requirements of 41 P.S. § 403, the limitations on the rate of interest chargeable to the borrowers in a business loan rather plainly do not. *See In re Jungkurth,* 74 B.R. 323, 329–31 (Bankr. E.D.Pa.1987), *aff'd,* 87 B.R. 333 (E.D.Pa. 1988) (interest at rate of over fifty (50%) percent not subject to a challenge that the loan was usurious in a "business loan"). The instant loans were indisputably business loans, arising in reference to an enterprise over which the Debtors, or at least the Husband, exercised managerial decisions, and concerning which, as we noted at page 776 *supra,* the Husband signed a statement setting forth this intended use. *See* 41 P.S. § 301(f)(v); 10 PA.CODE § 7.2 (definition of "Business loans"); and *Jungkurth, supra,* 74 B.R. at 330–31.

■ A somewhat more subtle issue is whether the Act 6 requirement, set forth in 41 P.S. § 401, that TILA disclosures be given in transactions within the scope of the TILA applies to business loans. It would intuitively seem rather apparent that the statement, in 41 P.S. § 401, that only disclosures required by TILA are required under that subsection would exclude a disclosure requirement in business loans, which are not within the scope of the TILA. However, the Pennsylvania Supreme Court, in *First Nat'l Bank v. Flanagan,* 515 Pa. 263, 265, 528 A.2d 134, 135 (1987), stated, in what this and other courts have noted is dictum, *See Gatti v. National Bank of the Commonwealth,* 696 F.Supp. 153, 155 (W.D.Pa.1988); and *In re Saler,* 84 B.R. 45, 47 n. 2 (Bankr.E.D.Pa.1988), that Act 6 "required disclosures in all cases

where residential real estate was affected, without regard to the loan's purpose."

We note that the Department of Banking, on February 20, 1988, took a highly unusual step of issuing a Statement of Policy ("the Statement"), 18 PA.BULL. 778–79, indicating that it believed that the court, in *Flanagan,* "did not expressly construe section 401" of Act 6 and that

lenders who have not given disclosures to residential mortgage debtors when none were required by [the TILA] … have acted in a manner consistent with the Department of Banking's interpretation of section 401 of the act.

*Id.* at 779.

We agree with the comments of the court in *Gatti, supra,* 696 F.Supp. at 155, and in the Statement, that it is unlikely that the *Flanagan* court meant to completely sweep away the consumer/business loan distinction which pervades the disclosure and other requirements of the TILA in application of 41 P.S. § 401. More likely than not, the *Flanagan* language meant to emphasize that certain provisions of Act 6, different provisions of which apply to different types of transactions, applied to the business loan transaction in issue. *Compare In re Fricker,* 113 B.R. 856, 864–68 (Bankr.E.D.Pa.1990); and *Jungkurth, supra,* 74 B.R. at 329–32.

■ We also join *Gatti* and the Statement in concluding that, if *Flanagan* did intend to express such a dramatic conclusion, at variance with intuition and other authority on the issue, *see M.H. Davis Oil Co. v. Hadley,* 43 Pa.D. & C.3d 308, 311 (Chester Co. C.P.1986), it should be applied prospectively only, *i.e.,* only to loans that post-dated it. Indeed, the principal holding in *Flanagan* itself is that a subsequent statute cannot abridge rights embodied in prior contracts. 515 Pa. at 269–70, 528 A.2d at 137–38. The same effect should be given to new doctrines announced by courts when parties have relied on contrary previous interpretations of the law. *See American Trucking Ass'ns, Inc. v. Smith,* 496 U.S. 167, 110 S.Ct. 2323, 2331–36, 110 L.Ed.2d 148 (1990); and *Brown v. Louisiana,* 447 U.S. 323, 327–29, 100 S.Ct. 2214, 2219–20, 65 L.Ed.2d 159 (1980). All of the

instant advances of credit from the Bank to the Debtors, including the execution of the Term Note of May 7, 1987, pre-dated the *Flanagan* decision of July 2, 1987.

Therefore, we reject all of the Debtors' claims based upon Act 6, as well as their other Objections to the Bank's claim. Accordingly, we will enter an order overruling the Debtors' Objections to the claim of the Bank and allowing the Bank's claim in its asserted amount of $15,321.51.