In re Barbara FARRIS, Debtor.

Barbara FARRIS, Plaintiff,

v.

JEFFERSON BANK, Defendant.

Bankruptcy No. 95–14728DWS.
Adv. No. 95–0530.

United States Bankruptcy Court,
E.D. Pennsylvania.

April 18, 1996.

Maria A. Sawczuk, Celli & Leto, L.L.P., Bala Cynwyd, PA, for Debtor/Plaintiff.

Domenic E. Pacitti, Lesser & Kaplin, P.C., Blue Bell, PA, for Defendant.

Edward Sparkman, Chapter 13 Trustee, Philadelphia, PA.

Joseph Minni, United States Trustee, Philadelphia, PA.

## OPINION

DIANE WEISS SIGMUND, Bankruptcy Judge.

Before the Court is the complaint ("Complaint") of Debtor, Barbara Farris ("Debtor"), objecting to the proof of claim filed by Jefferson Bank ("Jefferson").[1]  Debtor seeks

---

1. This matter is a core proceeding over which we have jurisdiction pursuant to 28 U.S.C. §§ 1334– 157(a), 157(b)(1), 157(b)(2)(A), (B) and (C).

to have this Court disallow Jefferson's claim in its entirety as violative of the Equal Credit Opportunity Act, 15 U.S.C. §§ 1691, *et seq.* ("ECOA").[2]

For the reasons stated herein, we find both for and against the Debtor, in part, with respect to the alleged ECOA violations by Jefferson. Although we conclude that Debtor failed to sustain her burden of proving that Jefferson violated the ECOA in requiring her signature on a certain mortgage, we nonetheless find that Jefferson violated the ECOA in requiring Debtor's signature on the note secured by the mortgage. Consistent with these conclusions, we overrule Debtor's objection with respect to Jefferson's secured claim, but disallow the claim to the extent that Jefferson is seeking recovery against Debtor personally for liability arising under the note.

### BACKGROUND

In their Joint Pretrial Statement ("Pretrial Statement"), filed on January 16, 1996, the parties stipulated to the following uncontested facts:

In 1986, Debtor's husband, Rahn Farris ("Husband"), approached Jefferson seeking a loan in the amount of $250,000.00 for one of his various business enterprises. During this time period the Debtor was "an unemployed housewife" with no assets in her own name. Husband, on the other hand, was an experienced business person who owned interests in several different companies and real estate properties. Debtor had no separate ownership interests in any of these businesses or properties, except for those equitable rights, if any, which may have accrued to her by virtue of their marriage. Additionally, Debtor did not own any stock, was not employed by and was not an officer or director of any

of Husband's businesses. However, Debtor did own an interest, as a tenant by the entirety, in the marital residence at 200 Clywyd Road, Bala Cynwyd, Pennsylvania ("Residence") and in properties located at One Executive Boulevard and at 3396 East Whiteside Road in Springfield, Missouri.

Husband's request to Jefferson for a business loan culminated in a loan ("Loan") being made to Debtor and Husband in the amount of $250,000.00. The Loan closed in late August 1986, at which time both Debtor and Husband signed a note ("Note"), *see* Exhibit "J–2," and mortgage ("Mortgage") on the Residence, *see* Exhibit "J–3." Husband made all of the payments on the Loan until it eventually went into default.

On February 2, 1994, Husband filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Bankruptcy Code.[3] On June 19, 1995, Debtor filed her own separate bankruptcy proceeding under Chapter 13.

Jefferson filed a proof of secured claim in Debtor's bankruptcy on June 23, 1995 in the amount of $117,051.98, based on the foregoing Loan transaction. *See* Exhibit "J–1." On July 21, 1995, Debtor filed the Complaint commencing this adversary action. The following additional facts were developed from the testimony and other evidence introduced into the record at the trial:

Debtor's first witness, Harmon Spolan ("Spolan"), Jefferson's current president and chief operating officer, testified that he was the president of Jefferson at the time that the Loan was made. Spolan testified that he was initially contacted about the Loan by Husband's attorney, Joseph Weiss ("Weiss"). He identified Exhibit "J–8" as a letter, which

---

**2.** The Complaint contains three counts. Count I seeks disallowance of Jefferson's claim based upon the ECOA and asks for an award of punitive damages, attorney's fees and costs; Count II seeks a reduction by way of recoupment in the amount of Jefferson's claim based upon the Truth in Lending Act, 15 U.S.C. § 1601 *et seq.;* and Count III seeks a reduction in the amount of Jefferson's claim insofar as it contains "unreasonable fees and costs."

    Prior to trial, Debtor withdrew her demand for punitive damages, attorney's fees and costs in

Count I and her claim for recoupment in Count II. At trial, she withdrew her claim in Count III, having reached an agreement with Jefferson that if judgment is awarded in its favor, it will file a motion under 11 U.S.C. § 506(b) to dispose of the issues raised in Count III. Thus, the only remaining claim is the ECOA violation raised in Count I.

**3.** Husband's bankruptcy case was subsequently converted to a proceeding under Chapter 7.

he received from Weiss, discussing the Residence as the collateral that was to be used as security for the Loan. Attached to Weiss's letter was a copy of a letter from Merrill Lynch Realty stating that the Residence had an appraised value of $315,000.00. Spolan testified that after receiving this information he turned the loan request over to Jefferson's loan committee for consideration.

Spolan identified Exhibit "J–6," which is dated June 21, 1985, as the financial statement that was reviewed in conjunction with the "Credit Request Report" prepared for the Loan. Record at 17. He acknowledged that this financial statement was over a year old at the time of its presentation to Jefferson, but explained that since the collateral being offered for the Loan had sufficient equity, the currentness of the financial statement was "not quite as important." *Id.*

Spolan identified Exhibit "J–11" as a copy of the "Jefferson Bank Loan Policy" which was in effect at the time that the Loan was being considered. He testified that the value of the Residence, less senior liens, plus the $50,000.00 that Husband was to deposit into an account at Jefferson, *see* Exhibit "J–8," satisfied the 80% of appraised value requirement for loans secured by real estate. Exhibit J–11 at p. VI–4(a.).

Husband was also called as a witness. He testified that the Loan was obtained for improvements that were needed on a business property which he owned at 1300 Admiral Wilson Boulevard in Camden, New Jersey ("Camden Property"). In response to Debtor's questions concerning why the Residence was used to secure the Loan, he testified that he thought he had suggested using the Residence for the Loan because it was the "cleanest" piece of collateral that he owned at the time after taking into account the existing liens on his other properties, the location of several of these properties outside of Jefferson's designated territory, *i.e.*, the Philadelphia area,[4] and the alleged ownership of the properties by partnerships with third parties.

Husband testified that while he applied for the Loan initially on his own, it was his position that Debtor concurred, and that ultimately they were borrowers together on the Loan. In this regard, Husband said that Debtor accompanied him to Jefferson's offices and voluntarily signed the Note and Mortgage. He could not recall if he ever reviewed any of these documents with her. He also doubted that he ever offered to explain any of the documents to her. He stated, however, that she was aware that the Residence was being mortgaged for purposes of the Loan.

Debtor was the only witness at the trial who claimed to have a memory of this transaction, or at least of her participation in it, that was not clouded by the passage of time. She testified that she first learned about the Loan only the day before her Husband asked her to go to Jefferson's offices to sign the Loan documents and that she never completed an application for a loan from Jefferson. Although corroborating Husband's testimony that he told her that the Loan was for the Camden Property, she disputed ever being informed about a mortgage being placed on the Residence, and asserted that she was told by Husband that her signature was necessary on the Loan documents because the Camden property was a marital asset. She contends that she was never told that she was signing a mortgage on the Residence to secure the Loan.

She testified that when she signed the Note and Mortgage at Jefferson Bank, her Husband, a bank officer and possibly Weiss were present. She stated that no explanation of the documents was provided to her, that the documents were already out and quite possibly open to the signature pages, and that she was asked merely to sign them.

Charles Kerrigan ("Kerrigan") testified that he was the loan officer who handled Husband's loan request and that he was

---

4. Section III of Jefferson's Loan Policy, Exhibit "J–11", states that:

The Bank's primary services area is understood to include the greater Philadelphia area, bounded by a radius of 75 miles from the Downingtown and Philadelphia Branch offices of the Bank. Extensions of credit shall be made outside of the trade area, only on an exception basis and with sufficient reason(s) to extend such credit.
*Id.* at p. III–I.

present on August 29, 1986, when the Loan documents were signed. He stated that his only personal contact with Debtor and Husband occurred at this meeting. Lacking any specific memory about what transpired at the meeting, Kerrigan testified that he probably, in accordance with his usual practice, explained all of the Loan documents to the parties, including the fact that a mortgage lien would attach to the Residence, before asking them to sign any of the papers.

With respect to the loan approval process at Jefferson, Kerrigan testified that while a loan request would typically originate with Spolan, it would be a loan officer like himself who would prepare the loan documents, obtain a credit analysis and present the loan request at a loan committee meeting. He testified that a credit analysis would usually entail obtaining a financial statement, conducting a property search, and obtaining an appraisal of any property offered as collateral.

He identified Exhibit "J–9" as the Credit Request Report that he prepared in connection with the Loan. He stated that this report would likely have been distributed to the Loan Committee members at the committee meeting to consider the Loan.

On cross examination, Kerrigan identified Exhibit "J–6" as the personal financial statement upon which the Bank relied in approving the Loan. Record at 80. Upon reviewing this financial statement, he testified that he did not believe there were any other real estate assets listed on the statement, other than the Residence, that Jefferson would have taken as security for the Loan, either because there was not enough equity in the property or because the property was not located in Jefferson's trade area. He stated that he was not aware of any instances in which Jefferson accepted a security interest in property outside of its trade area. He acknowledged that Jefferson would take other personal property as collateral and pointed out that in fact it did accept Husband's pledge of a $50,000.00 deposit in a money market account at Jefferson as part of it the collateral for the Loan. When asked specifically about whether it was common for Jefferson to take securities as collateral, he

admitted that it was "if they were marketable."

Finally, the parties stipulated that the Deposition Transcript of Weiss would be introduced into the record as evidence. As with each of the other witnesses, except for Debtor, Weiss qualified his testimony at the deposition by stating that his memory of the events relating to the Loan transaction was vague because it occurred nearly ten years ago.

Weiss testified that he represented both Husband and Debtor in the Loan transaction; however, he emphasized that he represented Debtor solely as Husband's wife and not in her individual capacity. Deposition Transcript at p. 8. Weiss could not recall: (i) whether he or Husband made the initial contact with Jefferson regarding the Loan; (ii) the purpose of the Loan; or (iii) who the borrower(s) were intended to be. *Id.* He testified, however, that the request for the Loan did come from Husband alone, with direction from him as to what the collateral for the Loan would be. *Id.* at p. 16. In this regard, he identified Exhibit "J–8" as the letter of August 18, 1986 that he sent to Spolan confirming the conversation in which he had made a request for a $250,000.00 loan to be secured by a mortgage on the Residence and a $50,000.00 deposit into an account to be maintained at Jefferson. *Id.* at 16–17. In pertinent part, the August 18, 1986 letter states:

> Pursuant to our recent discussion regarding the above captioned, I enclose herewith a copy of the letter provided me by Merrill Lynch Realty indicating the value of the property to be $315,000.00.
>
> As I indicated to you, there is a first mortgage of approximately $50,000.00 and we are requesting a second in the amount of $250,000.00.

Exhibit "J–8."

Weiss confirmed that the meeting to effectuate the Loan transaction took place in Kerrigan's office and took about a half an hour to complete. He testified that at the meeting he reviewed the Loan documents presented by Kerrigan with the Debtor and Husband and that he "explained what they were and

what they said." *Id.* at p. 14–15. He testified that he explained to both the Debtor and Husband that the documents were for a joint loan between them for $250,000.00 secured by a lien on the Residence. *Id.* at 15, 22.

Debtor argues that Jefferson's claim must be disallowed in its entirety because Jefferson violated the ECOA in obtaining her signature on the Note and Mortgage. She stresses that the Loan was made solely to her Husband for use in one of his businesses and that he had sufficient equity in other assets, including other real estate and business interests, to qualify as independently creditworthy under the standards in effect at Jefferson at the time. She also denies that she was ever an applicant on the Loan with Husband.

Jefferson responds by asserting that Debtor was a joint applicant for the Loan with Husband and that, accordingly, it was justified in obtaining her signature on both the Note and Mortgage in order to effectuate the security interest voluntarily granted in the Residence by both her and Husband. Jefferson also denies that it ever required Husband to provide a lien on the Residence as security for the Loan, but rather contends that it was Husband and Debtor who offered the Residence as collateral for the Loan. Having thus framed the issues, we proceed to consider the merits of the parties' positions.

### DISCUSSION

#### A.

The ECOA was enacted to protect consumers from discrimination by financial institutions in the extension of credit.[5] *E.g. Midlantic Nat. Bank v. Hansen,* 48 F.3d 693, 699 (3d Cir.), *cert. dismissed,* —— U.S. ——, 116 S.Ct. 32, 132 L.Ed.2d 914 (1995). In particular, § 1691(a)(1) of the ECOA states that "[i]t shall be unlawful for any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction ... on the basis of ... marital status." *Id.*[6]

Pursuant to § 1691b of the ECOA, the Federal Reserve Board ("Federal Reserve") was authorized to prescribe regulations for carrying out the purposes of the Act. 15 U.S.C. § 1691b. The regulations promulgated by the Federal Reserve are codified in Regulation B at Title 12 Code of Federal Regulations ("C.F.R.") parts 201.1–202.14 (1988).

Although independent actions for affirmative relief under the ECOA, *e.g.,* actions seeking damages, costs, attorneys' fees, are barred by the passage of the two year statute of limitations, 15 U.S.C. § 1691e(f), it is generally regarded that no such bar exists for defensive assertions of ECOA, in the nature of recoupment, designed to block a lender's attempt to enforce a credit instrument containing an unlawful signature, *see Silverman v. Eastrich Multiple Investor Fund, L.P.,* 51 F.3d 28, 32 (3d Cir.1995); *Integra Bank v. Freeman,* 839 F.Supp. 326 (E.D.Pa.1993), and we so held accordingly in our Order dated January 17, 1996 in denying Jefferson's motion for summary judgment.

The case law and legislative history of the ECOA establish that in general the burden of proof in ECOA cases is similar to that in Title VII employment discrimination cases. *See e.g. Bhandari v. First National Bank of Commerce,* 808 F.2d 1082, 1100 (5th Cir.) (language of the ECOA is "closely related to that of Title VII of the Equal Employment Opportunity Act ("EEOA"), 42 U.S.C. § 2000e–2, and was intended to be interpreted similarly"), *aff'd in part and modified in part on other grounds on rehearing by court en banc,* 829 F.2d 1343 (5th Cir.1987), *cert. granted, judgment vacated and matter remanded,* 492 U.S. 901, 109 S.Ct. 3207, 106 L.Ed.2d 558, *en banc decision reinstated,* 887 F.2d 609 (1989), *cert. denied,* 494 U.S. 1061,

---

**5.** Passed in 1974, the ECOA originally sought to prohibit credit discrimination on the basis of sex and marital status. The Act was amended in 1976 to also prohibit credit discrimination on the basis of race, color, religion, national origin and age. *See* 15 U.S.C. § 1691 (Historical Note); Pub.L. No. 94–239, 90 Stat. 251 (1976).

**6.** An applicant is defined in the ECOA as:
   [A]ny person who applies to a creditor directly for an extension, renewal, or continuation of credit, or applies to a creditor indirectly by use of an existing credit plan for an amount exceeding a previously established credit limit.
   15 U.S.C. § 1691a(b).

110 S.Ct. 1539, 108 L.Ed.2d 778 (1990); [7] *Cragin v. First Fed. Sav. & Loan Ass'n.,* 498 F.Supp. 379, 384 (D.Nev.1980). Under this approach the plaintiff has the initial burden of presenting a prima facie case of credit discrimination. If the plaintiff succeeds in establishing a prima facie case, the burden shifts to the defendant to articulate some legitimate, non-discriminatory basis for its action. Finally, should the defendant carry this burden, the plaintiff then has the opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were merely a pretext for discrimination. *Texas Dept. of Comm. Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981) (internal citation omitted). Throughout this process, however, the ultimate burden of persuasion remains with the plaintiff. *Id.* at 253, 101 S.Ct. at 1093.

### B.

The regulation at issue here is 12 C.F.R. § 202.7(d). This regulation sets forth a general rule in subsection (d)(1), with exceptions to the general rule following in subsections (d)(2), (d)(3) and (d)(4).[8] We will focus initially upon the general rule, which provides:

(d) *Signature of spouse or other person—*

(1) *Rule for qualified applicant.* Except as provided in this paragraph, a creditor shall not require the signature of an applicant's spouse or other person, other than a joint applicant, on any credit instrument if the applicant qualifies under the creditor's standards of credit-

worthiness for the amount and terms of the credit requested.

12 C.F.R. § 202.7(d)(1).

The term "applicant" as used in the Regulation means:

[A]ny person who requests or who has received an extension of credit from a creditor, and includes any person who is or may become contractually liable regarding an extension of credit. For purposes of § 202.7(d), the term includes guarantors, sureties, endorsers, and similar parties.

12 C.F.R. § 202.2(e) (1995) (as amended on January 1, 1986).

The term "joint applicant," as defined in the Official Staff Interpretations to 12 C.F.R. § 202.7(d)(1), means "'someone who applies contemporaneously with the applicant for shared or joint credit' and not someone 'whose signature is required by the creditor as a condition for granting the credit requested.'" *Midlantic Nat. Bank v. Hansen,* 48 F.3d at 699 (*quoting* Official Staff Interpretation to § 202.7(d)(1)). The regulations make it clear that the ECOA is violated when a lender requires a married applicant's spouse to cosign for a loan to the applicant even though the applicant is qualified individually under the lender's standards for credit worthiness. 12 C.F.R. § 202.7(d)(1); *see also Marine American State Bank v. Lincoln,* 433 N.W.2d 709, 712 (Iowa 1988) (*citing Anderson v. United Finance Co.,* 666 F.2d 1274, 1276 (9th Cir.1982)).

### C.

In applying C.F.R. § 202.7(d)(1) to the facts of the instant case, we find that it is

---

**7.** The Senate Report on the 1976 amendments to the ECOA states:

> The prohibitions against discrimination on the basis of race, color, religion or national origin are unqualified.... In determining the existence of discrimination on these grounds ... courts or agencies are free to look at the effects of a creditor's practices as well as the creditor's motives or conduct in individual transactions. Thus judicial constructions of anti-discrimination legislation in the employment field, in cases such as *Griggs v. Duke Power Company,* 401 U.S. 424 [91 S.Ct. 849, 28 L.Ed.2d 158] (1971), and *Albemarle Paper Company v. Moody,* [422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975)] are intended to serve as guides in the application of this Act,

especially with respect to the allocations of burdens of proof.

S.Rep. No. 589, 94th Cong., 2d Sess. 4–5, *reprinted in* 1976 U.S.Code Cong. & Admin.News 403, 406 (footnote omitted).

**8.** Subsection (d)(2) applies "[i]f an applicant requests unsecured credit and relies in part upon property that the applicant owns jointly with another person to satisfy the creditor's standards of creditworthiness"; subsection (d)(3) applies "[i]f a married applicant requests unsecured credit and resides in a community property state, or if the property upon which the applicant is relying is located in such state"; and subsection (d)(4) applies "[i]f an applicant requests secured credit." 12 C.F.R. § 202.7(d)(2)–(4).

undisputed that the Debtor is Husband's wife, and that she was required to sign both the Note and Mortgage for the Loan. We are also satisfied that the proof presented at the trial established that Husband alone was the applicant for the Loan. In this regard, it was undisputed that Husband approached Jefferson, either directly or through Weiss, for a commercial loan to be used for improvements needed at the Camden Property. It was also undisputed that the Debtor's only interest in the Camden Property was that it presumably was a part of the marital estate. Moreover, taken together the testimony of Spolan, Husband and Weiss established that the Debtor played no part in negotiating the terms of the Loan with Jefferson. We also find credible the Debtor's testimony that she first learned of the Loan only the evening before she was expected to go to Jefferson's offices with Husband to sign the Loan documents.[9] Additionally, we find as being generally consistent with the foregoing conclusion, the fact that in Weiss's correspondence with Jefferson regarding the Loan, he refers only to Husband and makes no reference at all to the Debtor. Exhibits "J–8" and "J–10". Based on the foregoing, it seems clear that Husband was the only applicant for the Loan and that accordingly, Debtor was not a joint applicant with him for purposes of applying 12 C.F.R. § 202.7(d)(1). This brings us to the issue of whether Husband independently qualified as creditworthy for the Loan. Before we address this issue, however, it is appropriate to review the evidence to ascertain whether any of the exceptions listed under § 202.7(d)(1) apply.

### D.

The evidence reveals that Husband offered the Residence to Jefferson as collateral for the Loan. Husband specifically testified that it was he who suggested using the Residence as collateral for the Loan, reasoning that it "was the cleanest piece of collateral" that he had. Record at 25. In addition, Weiss testified that he approached Jefferson, on Husband's behalf, for a $250,000.00 loan to be secured in part by a second mortgage on the Residence. *See* Deposition Transcript at pp. 16–17. Weiss's letter to Jefferson of August 18, 1986, confirms this by stating that R. Farris is "requesting a second [mortgage on the Residence] in the amount of $250,000.00". Exhibit "J–8".

Given the fact that Husband offered the Residence as security for the Loan, the exception in § 202.7(d)(4), for "Secured Credit," comes into play. This subsection sets forth an exception to the general rule contained in § 202.7(d)(1) which bars a lender from requiring a non-applicant spouse to sign a debt instrument when the applicant is independently creditworthy. Section § 202.7(d)(4) states:

> (4) *Secured credit.* If an applicant requests secured credit, a creditor may require the signature of the applicant's spouse or other person on any instrument necessary, or reasonably believed by the creditor to be necessary, under applicable state law to make the property being offered as security available to satisfy the debt in the event of default, for example, an instrument to create a valid lien, pass clear title, waive inchoate rights or assign earnings.

12 C.F.R. § 202.7(d)(4).

Under the exception contained in § 202.7(d)(4), Jefferson was entitled to require the signature of Debtor and Husband "on any instrument necessary, or reasonably believed by the creditor to be necessary, under applicable state law to make the [Residence] available to satisfy the debt in the event of default[.]" 12 C.F.R. § 202.7(d)(4). Jefferson contends that since the collateral that was offered to secure the Loan, namely the Residence, was owned by Debtor and Husband as tenants by the entirety, it was "necessary and reasonably believed . . . to be necessary" to obtain Debtor's signature on both the Mortgage and the Note in order to

---

**9.** Husband's testimony that the Debtor knew that the Residence would be mortgaged as a part of the transaction with Jefferson because she knew that someone had been through the house to appraise it for this purpose is not supported by the evidence. It is clear that if an inspection of the Residence occurred for purposes of appraising it, such inspection occurred in or about March of 1986, *see* Exhibit "J–8," which was months before Weiss's letter to Spolan on August 18, 1986. Therefore, the inspection bears no temporal proximity to the Loan transaction itself.

collateralize the Loan. We agree with Jefferson, but only in part. Under Pennsylvania law, "a tenancy by the entireties is an estate by which property, either real or personal, is held jointly by husband and wife with right of survivorship." *Spinelli v. Spinelli,* 264 F.Supp. 107, 109 (E.D.Pa.1967). Each spouse is "seized of the whole of the property and not of any share, divisible part or interest thereof." *McCormick v. Mid–State Bank & Trust Company,* 22 B.R. 997, 999 (W.D.Pa.1982) (citations omitted). Neither spouse may alienate or encumber property held as tenants by the entireties without the consent of the other. *See Spinelli v. Spinelli, supra* (under Pennsylvania law, neither spouse may alienate any portion of property held by them as tenants by the entirety for his or her own exclusive benefit without the consent of the other); *Schweitzer v. Evans,* 360 Pa. 552, 556–57, 63 A.2d 39, 41 (1949) (where real property is held by tenants by the entirety, neither tenant may convey any interest in the property without the other's authority or consent).

■ Applying the aforementioned principles of Pennsylvania law, we find that since the Residence was owned by Debtor and Husband as tenants by the entirety, neither Husband nor Debtor could legally encumber or alienate any portion of the property without the other's consent. Therefore, Debtor's signature on the Mortgage was necessary to encumber the Residence and provide Jefferson with the legal right to proceed against the property in the event of a default under the Loan. *See Philadelphia Consumer Discount Company v. Gurst (In re Gurst),* 1988 WL 78032 at *3 (E.D.Pa. July 25, 1988) ("Considering the nature of tenancy by the entireties under Pennsylvania law, a mortgage foreclosure action during the life of spouses must be brought against both spouses and cannot proceed against only one of them.").

■ The Note is a different story. As long as Jefferson had Debtor's signature on the Mortgage, it was not necessary for Jefferson to obtain her signature on the Note in order to acquire the right to proceed against the Residence in the event of a default under the Loan. Simply having her signature on

the Mortgage gave the bank the right to proceed against the Residence.

■ A mortgage may be created under Pennsylvania law "without any accompanying personal obligation or evidence of indebtedness of the mortgagor." *In re Morrison,* 69 B.R. 586, 590 (Bankr.E.D.Pa.1987). This principle of law has been recognized since at least 1885, when the Supreme Court of Pennsylvania noted that:

> Mortgages, in this state, are usually accompanied by a bond and warrant of attorney, etc. Sometimes they are given to secure notes, or other instruments, sometimes to secure warrants of indemnity, and sometimes in the naked, simple form of a mere mortgage, given for the purpose perhaps of securing the debt of a third person, and when they are given in any of these modes it has never been supposed, that an action of debt or covenant for the money will lie against the mortgage itself, but the remedy of the party upon the mortgage is against the land, and the land only.

*Baum v. Tomkin,* 110 Pa. 569, 573, 1 A. 535, 537 (1885) (*quoting Scott v. Fields,* 7 Watts 360)). *See also Herron, for Use of Murray, Receiver v. Stevenson,* 259 Pa. 354, 357, 102 A. 1049, 1050 (1918) (dismissing objection of "want of consideration," stressing that "[i]t makes not a particle of difference if the mortgagor was not a party to the note secured by the mortgage."). In a more recent decision, the Pennsylvania Supreme Court reiterated the principle, quoting from one of its earlier decisions:

> It is well settled in Pennsylvania that a mortgage may be executed without personal liability:
>
> > "A mortgage may be created as well without as with an accompanying personal obligation of the mortgagor to pay the debt secured, or attempted to be secured, thereby. In the one case the property alone is charged with the lien— is looked to solely by the mortgagee out of which to make his lien; in the other, he has the additional security of the personal obligation of the mortgagor. A debt chargeable only against certain property, is effect, simply a debt with

limited means of satisfaction or enforcement; the value of the property charged with the indebtedness is the measure of the security afforded."·

*In re Hartje's Estate*, 345 Pa. 570, 574, 28 A.2d 908, 910 (1942) (citations omitted). *Easton Theatres, Inc. v. Wells Fargo Land and Mortgage Co., Inc.*, 498 Pa. 557, 563–564, 449 A.2d 1372, 1375 (1982). Accordingly, under Pennsylvania state law, a valid mortgage can be created without requiring the mortgagor to assume personal liability under a note.

We, therefore, conclude that under Pennsylvania law, it was not necessary for Jefferson to obtain Debtor's signature on the Note in order to properly collateralize the Residence. However, this conclusion does not end our inquiry under 12 C.F.R. § 202.7(d)(4). Pursuant to this subsection, Jefferson was entitled to obtain Debtor's signature on the Note, despite our conclusion that it was not legally necessary, if Jefferson "reasonably believed" it was necessary in order to acquire the right to proceed against the Residence in the event of default on the Loan.

In determining whether Jefferson had a "reasonable belief," we turn to the Official Staff Interpretations of § 202.7(d)(4). The interpretation for this section states, in pertinent part:

> *Need for signature-reasonable belief.* Generally, a signature to make the secured property available will only be needed on a security agreement. *A creditor's reasonable belief* that, to assure access to the property the spouse's signature is needed on an instrument that imposes personal liability *should be supported by a thorough review of pertinent statutory and decisional law or an opinion of the state attorney general.*

Official Staff Interpretation to § 202.7(d)(4) (emphasis added).

We find no evidence in the record that Jefferson based its belief that Debtor's signature on the Note was necessary upon a review of the law, let alone a "thorough" review of the law. Indeed, Jefferson cites to only one case in support of its assertion that it "could obtain the offered security of the marital home only by having Plaintiff be a co-obligor on the loan." *See* Post-trial Memorandum of Defendant Jefferson Bank at 7. This case, *In re DiPietro*, 135 B.R. 773 (Bankr.E.D.Pa.1992) (Scholl, J.), held that a lender was justified under Pennsylvania law in requiring the signatures of both the sole applicant and his wife on the mortgage and note for a series of loans where the assets needed to secure the loan were held as tenants by entireties. As discussed below, we do not read *DiPietro* to support Jefferson's conclusion that Debtor was required to be a co-obligor on the Note in order to realize the value of the Mortgage upon default. Moreover, this case was not decided until 1992. Therefore, even if *DiPietro* did stand for the proposition stated by Jefferson, Jefferson could not have relied upon it in 1986 in concluding that Debtor's signature was necessary on the Note.

The issue before Judge Scholl in *DiPietro* was whether the husband was independently creditworthy.[10] In *DiPietro*, all of the husband's assets, including a tailoring business, were owned by him with his wife. *Id.* at 776–777. The lender, finding the husband not to be independently creditworthy and the mortgage and limited pledge by husband and wife to be insufficient security for the loan, obtained the wife's signature on the note in order to reach all of the assets owned by both the husband and the wife, not merely the real estate which was the subject of the mortgage. *Id.* Based on that record, Judge Scholl reasoned that since the assets were owned by both spouses, they were presumptively entireties property, *id.*, and under Pennsylvania law, unless both parties signed, "the Debtor's business and other personal property could not have been reached by the Bank upon default of the loans." *Id.* In contrast to *DiPietro*, the record here indicates that Jefferson was looking solely to the Residence as security for the Loan and not to other assets owned by Husband individual-

---

**10.** Section 202.7(d)(4), which specifically raises the issue of whether both spouses' signatures are needed on both the mortgage and the note to give the bank rights against entireties' property, was never even mentioned.

ly or together with his wife. *See* Record at 17 (testimony that since Residence offered sufficient equity for Loan, Jefferson was not concerned with obtaining a current financial statement from applicant).

Thus, we find Jefferson's citation to *In re DiPietro* unpersuasive in establishing that it had a "reasonable belief" that Debtor's signature was necessary on the Note. Moreover, as we mentioned above, Pennsylvania law has long held that the mortgagor need not be bound on a note to create a valid mortgage. Had Jefferson researched the issue, it should have been aware of this established law.[11]

Because we conclude that Jefferson did not have a "reasonable" belief that it needed Debtor's signature on the Note in order to acquire the right to proceed against the Residence in the event of a default on the Loan, § 202.7(d)(4) does not provide Jefferson with

a legal basis for having required Debtor's signature on the Note. This determination brings us back to the general rule set forth in § 202.7(d)(1) and the question of whether Husband qualified as independently credit-worthy for the Loan. If he so qualified, then Jefferson violated the ECOA in requiring Debtor's signature on the Loan.

### E.

■■■■ The evidence in the record establishes that Jefferson used Exhibit J–6, the financial statement dated June 20, 1985, in making its decision whether to extend Husband the Loan. A review of this financial statement, which is titled "Financial Condition of Rahn Farris," shows that the vast majority of assets identified thereon are listed as being titled solely in, or held solely by, "Rahn Farris."[12]

---

11. Additionally, our research uncovered an Opinion issued by the Office of the Attorney General of Maryland discussing § 202.7(d)(4). *See* 67 Md. Att'y Gen. 91, 1982 WL 187848 (February 18, 1982). This Opinion concludes that, under Maryland law, in order to encumber entireties property, it is necessary to have both spouses' signature on the mortgage but not on the underlying note. In reaching this conclusion, the Opinion states:

> Moreover, for real property held as tenants by the entireties to become security for a loan, both the husband and wife must consent to the encumbrance of the property because one spouse acting unilaterally cannot give a valid mortgage or deed of trust on the property. [citations omitted]. Therefore, the instrument that creates the mortgage lien must be executed and acknowledged by both the husband and wife. See Real Property Article §§ 1–101(c), 4–101(a), 5–101, and 5–103.

> It would not be necessary, however, for a spouse to sign the note that is secured by the mortgage in order to encumber the entireties property. As one commentator on the Maryland law of mortgages has stated:

> 'No note or other collateral paper is necessary to the validity of the mortgage debt. The mortgage instrument is enforceable without such paper. But where the mortgage does not contain a covenant by the mortgagor to pay the mortgage debt, and where there is no collateral note, bond, or other instrument which is secured by the mortgage, a personal action cannot be maintained against the mortgagor but the property alone is charged with the lien and must be looked to [to] satisfy the mortgage. A personal action may be maintained against the mortgagor where there is a collateral note,

bond or other instrument.' Ginsberg and Ginsberg, Mortgages and Other Liens in Maryland 116 (1936) (footnotes omitted).

> See also *Boyd v. Goldstein*, 223 Md. 255 [164 A.2d 336] (1960); *Barrell v. Glover*, 2 Gill 171 (1844); *Dougherty v. McColgan*, 6 G. and J. 275 (1834).

> Therefore, a spouse's signature is not needed on an underlying note or contract in order to give the creditor a security interest in the real property held as tenants by the entireties, if both spouses' signatures appear on the mortgage.

67 Md.Op.Atty.Gen. 91. 1992 WL 187848 (February 18, 1982). Our review of Maryland law shows that, as to the relevant aspects of the law on entireties property, *see e.g. Bruce v. Dyer*, 309 Md. 421, 427–428, 524 A.2d 777, 780–781 (1987); *Diamond v. Diamond*, 298 Md. 24, 29, 467 A.2d 510, 513 (1983) and mortgages, it is the same as Pennsylvania law. Thus, this Attorney General Opinion, although decided under Maryland law, could have provided Jefferson with guidance in determining whether Debtor's signature was needed on the Note. Significantly, the Opinion was issued more than three years before Jefferson obtained Debtor's signature on the Note.

12. Jefferson contends that, under Pennsylvania law, all of the assets listed on Exhibit J–6 are presumptively owned as tenants by the entireties since the assets were "acquired during the marriage." Post–Trial Memorandum of Defendant, Jefferson Bank at 7. Therefore, Jefferson asserts, it was reasonable to require Debtor's signature on the Note because, without it, the bank could not reach the jointly-held assets. *See id.* at 7–8. We believe that, in making this argument, Jefferson has confused the concepts of marital

All of the "Listed Bonds" as well as seven out of the nine "Listed Securities" are identified as being held solely in the name of "Rahn Farris." These assets are listed as having a total market value of $102,000 and $107,000, respectively. Also, all of the "Unlisted Securities" identified on financial statement, are listed as being held solely in the name of "Rahn Farris." These "unlisted securities" represent Husband's stock interests in four different businesses. The combined market value of these businesses is listed as $8,542,000. Thus, aside from any real estate which Husband owned individually or co-owned with another party other than his wife, Exhibit J–6 shows that he owned assets having a combined market value of over $8,700,000. We believe this evidence is sufficient to establish a prima facie case of a violation under ECOA, which shifts the burden to Jefferson to show that it had a legitimate reason for requiring Debtor's signature on the Note.

The only evidence that Jefferson offered to show that Husband did not qualify as independently creditworthy for the Loan was Kerrigan's testimony that the Residence was the only real estate asset listed on Exhibit J–6 that the bank would accept as security for the Loan. This testimony fails to explain how all of the other categories of assets listed on the exhibit entered into the Bank's equation when it evaluated Husband's creditworthiness.

Moreover, on cross-examination, Kerrigan testified that the Bank would take personal property as collateral for a loan, specifically identifying marketable securities as among the types of personal property that the bank would accept. While the focus in evaluating Husband's creditworthiness is not on the type of collateral that Jefferson would deem acceptable as security for the Loan, we find this testimony useful. If the bank would accept personal property as collateral for a

---

property and entireties property. These concepts are distinct. See *Livingston v. Unis*, 659 A.2d 606, 611 (Pa.Cmwlth.1995) ("Even though, in general, lottery proceeds won during a couple's marriage constitute marital property, that does not mean that the winnings should be treated like entireties property, for example, which, absent fraud, is not vulnerable to a debtor-spouse's creditors."); *Fratangelo v. Fratangelo*, 360 Pa.Super. 487, 498, 520 A.2d 1195, 1201 (1987) ("The presumption that all property coming into the marriage is matrimonial property is not equivalent to the creation of entireties property, which requires that the property be acquired in joint names of husband and wife").

Marital property is defined in 23 Pa.C.S.A. § 3501(a) as property acquired during a marriage. Real or personal property acquired by either spouse during a marriage is presumed to be marital property "regardless of whether title is held individually or by the parties in some form of co-ownership such as joint tenancy … or tenancy by the entirety." 23 Pa.C.S.A. § 3501. Importantly, the concept of marital property arises only in the context of divorce, when the spouses' marital property is being equitably divided. *See United States v. Premises Known as 717 South Woodward Street, Allentown, Pennsylvania*, 2 F.3d 529 (3d Cir.1993) (concluding that the Supreme Court of Pennsylvania would not read the marital property provision contained in 23 Pa.C.S.A. § 3501 as conferring upon wife any ownership interest in property, outside the context equitable distribution, where husband was listed as the sole record owner of such property). The concept does not apply here. Notably, even if it did apply, the record

does not contain evidence as to when the assets listed on Exhibit J–6 were acquired. Therefore, we would have no basis for concluding the assets on Exhibit J–6 were marital assets.

Turning to the presumption involving entireties property, property that is conveyed to, or held by, both a husband and wife is presumed to be held by them as tenants by the entireties. *See B.K. Medical Systems, Inc. v. Roberts (In re Roberts)*, 81 B.R. 354, 364 (Bankr.W.D.Pa.1987). *See also Clingerman v. Sadowski*, 513 Pa. 179, 183, 519 A.2d 378, 380–381 (1986) (a tenancy by the entireties "exists when property, either real or personal, is held jointly by a husband and wife"). *Accord In re Cribbs*, 411 Pa. 242, 249–250, 191 A.2d 379, 382–383 (1963) ("a bank account in the names of husband and wife is presumptively an estate by the entireties"); *In re Matson*, 374 Pa.Super. 61, 73, 542 A.2d 147, 152 (1988) ("In the absence of a designated title, it must be presumed that the Matsons held the cabin as tenants by the entireties."). However, when property is conveyed to, or held by, only one spouse, the presumption does not apply. *See In re Grubbs*, 113 B.R. 201, 202 (Bankr.W.D.Pa. 1990) (tenancy by entireties is presumed "where there has been a conveyance to both husband and wife," but where initial conveyance is to husband alone, presumption does not arise); *B.K. Medical Systems, Inc. v. Roberts (In re Roberts)*, 81 B.R. at 364 (holding that property titled to husband and wife was entireties property, but that property titled to husband individually was not). The vast majority of assets identified on Exhibit J–6 are listed as being held or titled solely in Husband's name. The presumption of entireties property does not apply to these assets.

loan, then it would seem logical that it would also give weight to such assets when evaluating an individual's creditworthiness for a loan. There is no evidence that it did so.

Based on the foregoing, we conclude that although the Debtor failed to sustain her burden of proving that Jefferson violated the ECOA in requiring her signature on the Mortgage, we nonetheless conclude that she succeeded in establishing that she did not apply for credit from Jefferson and that Husband qualified as independently creditworthy for the Loan. Jefferson, therefore, violated the ECOA in requiring her signature on the Note.