510 A.2d 764

**COMMONWEALTH of Pennsylvania**

v.

**Robert E. WOLF, Appellant.**

Superior Court of Pennsylvania.

Submitted Jan. 16, 1986.

Filed May 29, 1986.

John R. Kelsey, III, Lebanon, for appellant.

John E. Feather, Jr., Assistant District Attorney, Lebanon, for Com., appellee.

484

POPOVICH, Judge:

This is an appeal from a judgment of sentence (two to four years imprisonment) for criminal conspiracy by the appellant, Robert Wolf. We affirm.

The facts, when viewed in a light most favorable to the verdict-winner and drawing all reasonable inferences therefrom, reveal that on the 26th of January, 1983, thirteen-year-old Crystal Swisher was playing video games in the Circle B Laundromat in the City of Lebanon when she was approached by one Dean Stofko, someone she had met once. He asked her for $1.50 to help purchase a bottle of grain alcohol. Ms. Swisher not only gave him the money, she agreed to join him and his friends in drinking it.

The two waited outside the laundry until Stofko's friends (Timothy Kramer, Dave Weatherholtz, Mitch Miller and the appellant) had secured the alcohol. The six then walked across the street to an apartment, but they left when it was discovered that there was no orange juice to mix with the liquor. As a result, Stofko and his friends decided to repair to Weatherholtz's premises. Ms. Swisher went along.

The group arrived at the apartment around 5:00 p.m. and found Weatherholtz's wife (Lori) and two children there. The appellant and Dave Weatherholtz then proceeded to the kitchen to mix the 190 proof grain alcohol in a punch bowl with orange juice. The others, i.e., Kramer, Stofko and Miller, stayed in the living room with Swisher. At this time, Lori advised her husband that she was going to the store to buy cigarettes, and that she would take their daughter along. He was to watch the one-year-old son while she was gone.

Thereafter, the appellant brought in drinks and set one on a table in front of Swisher. At this point, Kramer sat on one arm of a chair and Stofko rested on the other arm as Swisher was in the middle.

Swisher had three drinks of grain alcohol mixed with orange juice at first and later she drank the "grain straight." She became dizzy and on the verge of passing out. Somehow, although she was initially sitting on a chair, she found herself on the couch, from which she eventually slipped or fell onto the floor. Two of the individuals present carried her upstairs. Thereafter, she recalls being placed on the bed. Her clothing was removed, and she was tied to the bed by her ankles and wrists. Next, the victim recounted how each of the five males took turns sexually assaulting her. The assault lasted no more than twenty-five minutes, for this was the length of time Lori Weather-holtz was away from the apartment. When she returned, she discovered what was going on in her bedroom and directed everyone to leave.

The victim said that after she left the premises, she was pursued for some distance by members of the group. A crowd had gathered, and this attracted the attention of Officer Robert Bowman. Upon investigation, the officer found the victim "having a fit. She was kicking the wall, the ground and saying 'Leave me alone. I want to die.'" Seeing that the victim was intoxicated and emotionally upset, the officer decided to transport her to the emergency room of the Good Samaritan Hospital.

On the way to the hospital, the victim was obstreperous. When asked by the officer why she was acting in such a manner, she reportedly stated, "How would you feel if you were just raped by five guys?"

Once at the hospital, the officer checked the victim's ankles and wrists and detected what he termed "rope burns and indentations on the inside of both ankles and on the wrists." Two detectives from the Lebanon Police Department confirmed the "very hysterical" condition of the victim while at the hospital.

Test results from the hospital established that the victim had engaged in sexual intercourse. There was also evidence at trial that the appellant, following his arrest but prior to any incarceration, approached one of the detectives

investigating the case to strike a "deal" to minimize any potential sentence he might receive if the case went to trial. This same detective testified that the appellant, in the second of three contacts, admitted witnessing the victim being sexually assaulted. However, he stated he never participated in this attack. This point, interestingly enough, was corroborated by the tests performed by the Federal Bureau of Investigation on the bed linen, i.e., of all the hair samples secured, only those of the victim, Weatherholtz and Kramer matched those found on the bed sheet.

When the appellant took the stand, he admitted to placing a drink in front of the victim and to hearing conversation among the group about sexual relations. He also stated he asked the victim her age and was told 17. Further, Wolf mentioned that, except for seeing two figures on the bed, he observed nothing unusual when he was in the bedroom.

The jury heard all sides of the story, including witnesses on behalf of the appellant assailing the reputation of the victim for truthfulness in the community and one's recollection that shortly after the incident in question the victim admitted to him that she had read about sexual bondage in a magazine and wanted "to see how it is ... when you are tied up."

Following a verdict in which the jury found the appellant guilty of conspiring to promote or facilitate the crime of statutory rape, but not guilty of statutory rape and involuntary deviate sexual intercourse, post-trial motions were denied, a sentence was imposed and this appeal was perfected.

Of the four issues raised by the appellant, we find it necessary to respond to only one because of its sparse treatment in this Commonwealth. All others were adequately addressed by the court below in its opinion to this Court and we adopt it as our own for allocatur purposes.

All parties concerned look to the ruling of this Court in *Commonwealth v. Calloway*, 313 Pa.Super. 173, 459 A.2d

795 (1983) to resolve the issue of whether an offer to compromise is admissible in a criminal case,[1] although each comes away with an interpretation supportive of their respective positions.

In the course of its ruling that the defendant's offer to plead guilty was properly admitted at trial because he was not under arrest, and, thus, there was no reason for this Court to assume that the defendant was offering to plead guilty to a crime for which he had not been charged, the *Calloway* Court set forth some guidelines to assess the admissibility of such an offer at trial; to-wit:

> Initially, however, it must be determined in such cases whether or not the statement or statements made by an accused are in connection with plea negotiations. *U.S. v. Robertson*, 582 F.2d 1356 (5th Cir.1978) provides a workable analytical framework to determine the appropriate characterization:

> ... first, whether the accused exhibited an actual subjective expectation to negotiate a plea at the time of the discussion, and second, whether the accused's expectation was reasonable given the totality of the objective circumstances. *Id.* at 1366.

> Of primary importance in assessing an accused's subjective expectation of negotiating a plea is whether the Commonwealth showed an interest in participating in such discussions. In line with this reasoning, voluntary, unsolicited statements uttered by an accused to authorities cannot be said to be made in furtherance of striking a plea bargain.

313 Pa.Super. at 184–85, 459 A.2d at 800–801.

Instantly, albeit the appellant was under arrest, our analysis does not stop there. Rather, we are required by *Calloway* to ascertain the accused's "subjective expecta-

---

1. We would note that the appellant's "deal" to a police officer renders his "spontaneity" argument (see discussion infra), offered to undermine the existence of a confederation, suspect. Compare *Commonwealth v. Kennedy*, 499 Pa. 389, 453 A.2d 927 (1982).

tion" in offering to make a "deal" with one who was not a representative of the District Attorney's Office.

The facts in this regard indicate that, on the 18th of August, 1983—this was after the second meeting wherein the appellant admitted seeing the victim assaulted, Detective Capello was working at his desk when the appellant, unannounced, walked into his office and:

> He told me he would like to make a deal concerning his charges, and I informed him that he—I could not make a deal, he would have to talk to his attorney and also the D.A.'s office, and anything they worked out would be up to them. It was his opinion at that time—he told me that he thought Crystal had been through enough and he didn't think she should have to go through another trial, because what they did to her was stupid, but when you drink you do stupid things.

We read *Calloway* to condone the admission of any offer, whether it be made to a police officer or to an assistant district attorney handling the case, provided the Commonwealth showed no interest in participating in such discussions and the statements uttered were voluntary and unsolicited. This appears to be the case here.

Our reading of the facts discounts the presence of any plea negotiations. If it were otherwise, there would have been no reason for the accused to have pleaded his case to a police officer. The fact that the accused may have been "testing the waters" by approaching someone totally foreign to the plea process is indicative of the volitional nature of his statements.

Further, at no time did the accused point to evidence of any "interest" on the part of the Commonwealth to engage in any type of negotiations, be they before or after the statements. These facts, under the teaching of *Calloway*, would require that we not afford the accused a shield to his extemporaneous remarks.

Just as the criminal law does not afford one solace in a case where he *spontaneously* makes incriminating state-

ments, we see no reason to accord a different status to statements made by one in a voluntary and unsolicited context. If the Commonwealth or a representative of the authorities had initiated the inquiry, or shown an interest in resolving the case short of a trial, we would not hesitate to protect the accused's actions. However, such is not the case at bar.

Accordingly, believing that one who speaks should be held accountable for his actions, we hold that the appellant's statements to Detective Capello were admissible, and, therefore, no new trial is warranted.

Judgment of sentence affirmed.

DEL SOLE, J., files a dissenting opinion.

DEL SOLE, Judge, dissenting:

I dissent from the Majority's determination that Appellant's statements to Detective Capello were properly admitted at trial.

This court in *Commonwealth v. Calloway*, 313 Pa.Super. 173, 459 A.2d 795, (1983) announced: "any statements made in connection with an offer to plead guilty are inadmissible". Appellant's statements to Detective Capello cannot be characterized as anything other than statements made in connection with an offer to plead guilty.

The Majority in interpreting the holding of *Calloway* states: "In the course of its ruling that the defendant's *offer to plead guilty* was properly admitted at trial because he was not under arrest ... the Calloway Court set forth some guidelines to address the admissibility of *such an offer* at trial". Majority Opinion at 487, emphasis added. The error with the Majority's analysis rests in its conclusion that the appellant in *Calloway* made an offer to plead guilty. The *Calloway* court admitted the appellant's statements because they did not amount to an "offer to plead

guilty". The *Calloway* court stated: "In the instant case, we conclude that appellant's statements were not made attendant to plea negotiations". *Commonwealth v. Calloway*, 313 Pa.Super. at 185, 459 A.2d at 801. Accordingly, the guidelines set forth by the *Calloway* court do not "assess the admissibility of such an offer", rather they aid in characterizing a statement as an offer.

This distinction is important and was recognized by an Illinois Appellate Court in citing *Calloway*. In *Illinois v. Tennin*, 123 Ill.App. 894, 79 Ill.Dec. 64, 463 N.E.2d 202 (1984), the court noted that in cases where statements were found inadmissible as plea related, each defendant clearly sought a concession. When a defendant did not make manifest his plea offer the statements were not characterized as part of a plea discussion and were admitted at trial. To constitute a statement made in connection with an offer to plead guilty it must contain rudiments of the negotiation process. The court in *Illinois v. Tennin, supra,* also outlined other explanations for statements seeking a "deal" which would indicate that they were not plea related. Such would be the case where one sought to negotiate his release without bond, or where one requested that the charges against him be dropped in exchange for information. Statements made in these instances would not constitute statements made in connection with an offer to plead guilty.

To determine whether or not the statements made by an accused are in connection with plea negotiations, a court must first look to see if the accused exhibited an actual subjective expectation to negotiate a plea, and whether that expectation was reasonable. The totality of the circumstances including the Commonwealth's interest in participating in such a discussion must be examined to determine if the statements were plea related. *Commonwealth v. Calloway, supra,* 313 Pa.Super. at 184, 459 A.2d at 801.

In holding that the appellant's statements in *Calloway* were simply unsolicited, unilateral remarks and that the

appellant could not have had a reasonable subjective expectation that his statements were made in regard to a plea negotiation, the court stated:

Appellant at the time he uttered the statements, was not under arrest, and would not be placed under arrest for the crime until some three months after his personal communication with the district attorney. Not being a defendant, there is then no reason for us to assume that he was offering to plead guilty to a crime for which he had not been charged. There are myriad possible explanations underlying his motivation to provide "information" for a "deal". We do not know what "information" was or what type of "deal" he wanted to arrange. Neither did the district attorney. We know what appellant claims now, *i.e.*, he was attempting to open a plea bargaining discussion, but our focus seeks an explanation at the time the statements were made.

*Id.*, 313 Pa.Superior Ct. at 185, 459 A.2d at 801.

The statements made by Appellant in the instant case when analyzed with regard to the totality of the circumstances cannot be characterized as anything other than plea related. Unlike the appellant in *Calloway*, Appellant herein was under arrest when according to the Commonwealth's version of the incident:

... (O)n August 18, 1983, Detective Capello was working at his desk in the Detective Division of the Lebanon City Police Department when the defendant came into Capello's office, unrequested; sat next to Capello's desk and began talking. Capello had not requested any information from the defendant. First, the defendant told Capello that he had been arrested for "drunk driving" after running a stop sign. Wolf then told Capello he want to make a deal with the District Attorney to consolidate the charges of statutory rape and "drunk driving" so that he could do all his time at once. Wolf expressed concern that if he did his time separately, he would be in jail for a long time. Wolf also said that the victim had been

through enough, she shouldn't have to go through another trial, what they did to her was stupid, but when "you are drinking you do stupid things." Capello responded by telling Wolf he would have to talk to his lawyer and sent him on his way.

Commonwealth Brief at 4–5.

It is inconceivable that there is any explanation for Appellant's statements other than that they were made in connection with an offer to plead guilty.

The majority in determining that the statements are admissible relies on the fact that the Commonwealth showed no interest in participating in a discussion. While the *Calloway* court noted that the Commonwealth's interest in participating in the discussions is important to assess the accused's subjective expectation of negotiating a plea, the *Calloway* court did not set forth this type of finding as the dispositive test to determine if the statements were plea related. To rely solely on the Commonwealth's unwillingness to enter plea negotiations would be unfair and contrary to the purpose of the Rule which seeks to protect a defendant from adverse inferences based upon statements made when seeking to negotiate a plea. The court in *Calloway* recognized that a system which encourages plea bargains is an essential and highly desirable component of the administration of justice.

Under the decision reached by the Majority today, only the Commonwealth could initiate plea bargaining. There would be no instance where an accused could approach the Commonwealth and seek to initiate a plea arrangement. I do not believe such a result was intended by the *Calloway* court.

Since I would find that the statements made by Appellant to the detective were made in accordance with an offer to plead guilty, I would reverse the Judgment of Sentence and remand the case for a new trial.