J-S24034-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| CHRISTOPHER RYAN YOHE | : | |
| | : | |
| Appellant | : | No. 327 WDA 2020 |

Appeal from the Judgment of Sentence Entered January 16, 2020
In the Court of Common Pleas of McKean County Criminal Division at
No(s):  CP-42-CR-0000407-2018

BEFORE:   DUBOW, J., KING, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.:          **FILED: SEPTEMBER 3, 2021**

Appellant, Christopher Ryan Yohe, appeals from the judgment of sentence entered in the Court of Common Pleas of McKean County after a jury found him guilty of Rape, Burglary, and various other offenses committed against his ex-girlfriend inside her home. Appellant's counsel petitions to withdraw under ***Anders v. California***, 386 U.S. 738 (1967), and ***Commonwealth v. Santiago***, 978 A.2d 349 (Pa. 2009).  After review, we grant the petition to withdraw and affirm judgment of sentence.

The trial court provides an apt factual and procedural history of the case, as follows:

> Looking, as we must, at the record in a light most favorable to the Commonwealth as the verdict winner, the record reflects that . . . the victim in this case[] was the ex-girlfriend of Christopher Yohe, the [Appellant].  Her [trial] testimony [was] as follows:

---

[*] Former Justice specially assigned to the Superior Court.

On June 14, 2018, upon returning home from work, [the victim] received a phone call from a number with no caller ID. N.T. 8/26/19, at 16. She answered the phone and recognized the voice to be that of her ex-boyfriend, the [Appellant], who asked if he could come see her. *Id*. The victim asked the [Appellant] if he "would just leave me alone." *Id*. the [Appellant] said, "no", and it was at this point the victim realized that the [Appellant] was in her house right behind her. *Id*.

The victim asked the [Appellant] to leave, but he refused and forced her against the wall. *Id*. They eventually made their way to the living room, where they argued and the victim repeatedly asked the [Appellant] to leave. N.T. at 17. Eventually, the [Appellant] shoved the victim down onto the couch and proceeded to show her the contents of his backpack: duct tape, rope, and a garden cutting tool. *Id*. When the victim asked what he was going to do with the cutting tool, the [Appellant] stated, "just in case you don't want to cooperate with me" and then grabbed her finger saying he was going to cut it off. *Id*. He then said he was "just kidding" and asked "do you honestly think I would do that to you?" *Id*.

The victim continued to ask the [Appellant] to leave. *Id*. The [Appellant] said he wanted to have sex with the victim, to which she replied that she just wanted him to leave and "it's not going to happen." *Id*. The [Appellant] then said, "it's going to happen either way." *Id*. He then unzipped his pants, got on top of the victim, pinned her down, and rubbed his penis on her face, getting "precum" on her face. *Id*. The [Appellant] kept asking the victim to "suck it." N.T. at 18.

He then pulled the victim's shorts off[] and performed oral sex on her. *Id*. The victim continued to ask him to stop, and he then penetrated her with his penis. *Id*. The [Appellant] then stopped and said, "You know what? I can't do this." *Id*. Eventually, the victim was able to leave her house, at which point she contacted a friend who came to meet her. N.T. at 19.

. . .

On July 12, 2018, there was an outstanding bench warrant for the [Appellant]. He had been apprehended and was being held in the Somerset County Jail. Chief Tom Munn and Officer Lamade

- 2 -

of the Foster Township Police Department traveled to the Somerset County Jail solely for the purpose of transporting the [Appellant] back to McKean County to attend the proceedings regarding this case. N.T. at 133.

During the transport, Chief Munn specifically instructed the [Appellant] not to talk about the case. N.T. at 134. He told him, "Even if you think I am asking you something about the case, I'm not questioning you. I urge you not to talk to me about the case." *Id*. Nevertheless, the [Appellant] voluntarily chose to start talking about the charges he was facing in McKean County.

During the 2 or 3 hours, the [Appellant] began making statements about this case and then indicated, "Oh, that's right. We're not supposed to talk about that stuff." N.T. at 135. The [Appellant] then indicated, totally unsolicited by the officers, that "he would take a deal for three years." N.T. at 133-34. Officer Munn never told the [Appellant] that he had the authority to negotiate a plea agreement for the Commonwealth. N.T. at 136.

. . .

On June 15, 2018, Appellant was charged with Rape Forcible Compulsion, Sexual Assault, Aggravated Indecent Assault without the Consent of Another; Criminal Trespass – Enter Structure; Burglary, Overnight Accommodation, Person Present, Personal Injury Crime; Indecent Assault without Consent of Another; and Unlawful Restraint. The matter proceeded to preliminary hearing, where all charges were bound over to the trial court.

On August 26, 2019, Appellant's jury trial commenced, where] the following exchange occurred between defense Attorney Christopher Martini and the victim []:

| **Defense Counsel**: | I believe you had indicated that Mr. Yohe was your ex-boyfriend? |
|---|---|
| **Victim**: | Yes. |
| **Defense Counsel**: | Okay. Was he living with you at that address? |

- 3 -

| | |
|---|---|
| **Victim**: | No. |
| **Defense Counsel**: | Never? |
| **Prosecutor**: | Objection, Your Honor. |
| **Trial Court**: | What's the basis of your Objection? |

N.T. at 56.

Trial Court Opinion, 11/23/20 at 2-6.

This exchange, the sidebar discussion it generated, and defense counsel's subsequent questioning on cross-examination implying that Appellant and the victim maintained a relationship in which he was allowed to be present in the victim's home on the day of the alleged burglary and rape eventually led the trial court to rule the victim could testify that a Protection From Abuse ("PFA") Order was in place against Appellant prohibiting him from being at her residence.

Specifically, the parties had entered into a pre-trial stipulation permitting reference at trial to an existing "Order" that barred Appellant from approaching the victim or her residence. The court agreed with the Commonwealth, however, that defense counsel's line of questioning on cross-examination was concerning and, thus, close to "opening the door" to the Commonwealth presenting rehabilitating evidence regarding the PFA Order. N.T. at 57.

Nevertheless, the trial court overruled the Commonwealth's objection but offered a sidebar admonition that if defense counsel "opens the door to

other things then he opens the door." N.T. at 57. Cross-examination resumed, and the trial court eventually determined that defense counsel, as part of his trial strategy, sufficiently opened the door to permitting reference to the PFA Order because he had persisted in a line of questioning that directly implied Appellant and the victim were involved in a relationship on the day of the alleged crimes.

The continuation of the excerpt from Appellant's trial transcript contains the testimony and sidebar discussions leading to the court's ruling and shows the extent to which the court thereafter permitted reference to the PFA Order.

| | |
|---|---|
| **Prosecutor**: | Objection, Your Honor. |
| **Trial Court**: | What's the basis of the objection? |

(Counsel approach the bench for a sidebar.)

| | |
|---|---|
| **Prosecutor:** | There was a PFA in place with these people, and then there were numerous PFA violations. So, we've taken great strides to not mention that. So, I – my objection – |
| **Trial Court**: | I think you did in your stipulation though. |
| **Prosecutor**: | We didn't say "PFA" because if that's the case, I have a lot more to talk about. |
| **Defense Counsel**: | We just said "Order." But she had indicated that that's her ex-boyfriend now, but then she subsequently told Officer McDonald, like – something like 30 days after the alleged assault that he was living there. |

**Prosecutor**: No, he – no, she didn't.

**Trial Court**: It goes to – the element of the Burglary, whether he had permission to be there or not. So, I'm going to overrule the objection. If he opens the door to other things, then he opens the door – but he can certainly explore, if that's the strategy, whether he had permission to be there or not.

**Prosecutor:** Alright.

(end of sidebar)

**Trial Court:** The objection's overruled. If you'd please re-state the last question.

. . .

**Defense Counsel**: He never lived with you there?

**Trial Court**: The last question – and you can cor – either attorney should correct me if I'm wrong or the Court Monitor – was he residing there? The answer was, ["]no.["] And then the next question was ["]Never[?"] So, if you could answer that question.

**Victim**: Christopher was living with me for a little while but not in the month of June.

**Defense Counsel:** Do you know if he had a key to the house?

**Victim**: I don't know.

. . .

[at sidebar]

**Prosecutor**: Your Honor – Your Honor, I have another thing.

- 6 -

| | |
|---|---|
| **Trial Court**: | Okay. |
| **Prosecutor**: | I do believe that he's opened the door with the PFA, and I want to explore that with her. . . . |
| **Defense Counsel**: | I don't think I've opened the door to anything. I just asked if he was ever (inaudible) there period. There's an Order of Court that – there's a stipulation. There's an Order of Court that he shouldn't be there. The jury can – can accept that, but I don't think we have to go into the details of what the Order was for. |
| **Prosecutor**: | Of course, you don't; but I think it's relevant as to why he's no longer living there. |
| **Trial Court**: | My ruling on that is that you can open the door a lot of different ways, either directly or indirectly; and the question, "Was he living there? Never[?]" the tone of that and as well as the answer that he wasn't living there in June raises the question in the jury's mind or could raise the question. |
| | . . . |
| | But nonetheless, it's the practical reality of the situation, and it – the – the PFA specifically says, "You can't go here. You can't be here. You can't have contact." And to try to dance around that issue, it's almost impossible; and the parties attempted that. And it didn't work because you each tried to say, "Well, this is an Order." Well, what's that mean? And then, there's questions about, "Well, when did he last live there?" "He never lived there[?]" That opens it up for the need of the Commonwealth to say, "This |

| | |
|---|---|
| | is how – and it – this is how she knew he shouldn't be there. This is how he knew he shouldn't be there." |
| | . . . . |
| **Defense Counsel**: | I just – I just want to be clear regarding Your Honor's ruling. In terms of the original reason for the PFA, that would not come in. That would be a prior bad act. |
| **Trial Court**: | That's correct. That's – absolutely correct. |
| **Prosecutor**: | But I think what you're – I – which I understand – I could get the PFA and the fact that he has violated. |
| **Trial Court**: | You – you can get in that she knew he wasn't supposed to be there because she had sought a Protection From Abuse Order, obtained it. And if you can show it – I don't know if you can – or not – that he knew he wasn't supposed to be there. And – and that has bearing on when she turns around and he's there, he's had this Order. Now, if there's other information that I don't know – but then that opens the door for instance, "Well, there was [an Order] but she told me I could come over whenever I wanted." I'm not a mind reader. I'm just saying if it does, it opens it. |
| **Prosecutor**: | Okay. |
| **Defense Counsel**: | I guess I would just respectfully note an objection for the record for the PF – the fact of the PFA coming in, and I understand Your Honor's ruling, but I just want to preserve the issue. |

N.T. at 56-57, 60-64.

- 8 -

After Defense Counsel completed cross-examination, the Commonwealth requested a sidebar prior to conducting re-direct.

| | |
|---|---|
| **Prosecutor**: | (Inaudible – papers are over the microphone) about the PFA violations also. I think that explains why she contacted Officer McDonald specifically. And I just want to make sure that you're aware of that. |
| **Trial Court**: | Why don't you just ask her, "Why'd you contact Officer McDonald?" |
| **Prosecuto**r: | Okay. I can ask her about the PFA? |
| **Trial Court**: | You can, but we're not getting into the violations. If – say there's some specific need, I might allow it; but then we're getting into bad acts because, in fact, it's a criminal violation if – |
| **Prosecutor**: | Right. |

. . .

(end of sidebar)

. . .

| | |
|---|---|
| **Prosecutor**: | Ma'am, did you seek a Protection From Abuse Order against the [Appellant]? |
| **Victim**: | I did. |
| **Defense Counsel**: | Same objection as I had at sidebar. |
| **Trial Court**: | Overruled. |
| **Prosecutor**: | And was that granted by the Court? |

**Victim**: Yes.

**Prosecutor:** Okay. And was it that Order that prohibited [the Appellant] from coming to your residence of contacting you?

**Victim**: Yes.

. . .

**Prosecutor**: Okay. (Pause.) Now, when you got the Protection From Abuse Order, prior to that, do you know if the [Appellant] had a key to your residence?

**Victim:** I don't know.

**Prosecutor**: Okay. Now, you testified that you locked everything in your house up when you had gone to work [on the day of the alleged burglary and rape].

**Victim**: Yes.

**Prosecutor**: Do you specifically recall doing that?

**Victim**: Yes.

**Prosecutor:** And why did you make sure that everything was locked that day?

**Victim**: Due to having the PFA, it just kind of became a habit of making sure everything was locked before I left.

. . .

[Defense Counsel on re-cross]

**Defense Counsel**: [W]hen did you move into [the residence involved with the alleged crime in question]?

**Victim**: When did I?

**Defense Counsel**: When.

**Victim**: February/March.

**. . .**

**Defense Counsel**: February/March of 2018?

**Victim**: Yes.

**Defense Counsel**: Okay. And was the PFA in place at that particular time?

**Victim**: Yes.

**Defense Counsel**: And when you went to that particular home, were you still in a relationship with Mr. Yohe?

**Victim**: I was seeing him with the PFA, yes.

**Defense Counsel**: Okay. So, in terms of that particular home [], did you permit him to be there?

**Victim**: Yes.

**Defense Counsel**: Did he have his possessions in that home?

**Victim**: No. Well, he had, like, his clo – like, some of his clothes there.

**Defense Counsel**: Okay. And in terms of – you permitted him to be in the home, correct?

**Victim**: At that time, yes.

**Defense Counsel**: Okay. And it's my understanding pursuant to your testimony that you consented to him being in the home up until I believe you said the first of June of 2018.

**Victim**: We were not together in June, no.

. . .

**Victim**: We ended things the -- the month before.

**Defense Counsel**: Okay. Did you give him particular notice at some particular point in time that he could not be there anymore?

**Victim**: Yes. And –

**Defense Counsel**: Okay. Do you recall the specific date?

**Victim**: I can't remember pacific (sic) date, no.

. . .

**Defense Counsel**: So, notwithstanding the Protection From Abuse Order, you maintained a relationship with Mr. Yohe, correct?

. . .

**Victim**: Yes.

. . .

[Prosecutor on further re-direct]

**Prosecutor**: Now, ma'am, in June of 2018 and specifically, June 14, 2018, did this [Appellant] have permission to be at your home?

**Victim**: No.

**Prosecutor**: Did he have notice of that fact?

**Victim**: Yes.

**Prosecutor**: Okay. Were you dating him at this time?

**Victim**: No.

| | |
|---|---|
| **Prosecutor**: | Did he know you were not dating him? |
| **Victim**: | I told him no. |
| **Prosecutor**: | Okay.  And, in fact, that night, your testimony I think was he was trying to get back with you. |
| **Victim**: | Yes. |
| . . . | |
| **Defense Counsel**: | Ma'am, you indicated you gave the [Appellant] notice that you were not in a relationship anymore? |
| **Victim**: | Yes, I – |
| **Defense Counsel**: | Can you – |
| **Victim**: | -- told him the month before |
| **Defense Counsel**: | Do you recall a specific date? |
| **Victim**: | In the middle of the month. |

N.T. at 74, 76, 80-87.

On August 27, 2019, at the conclusion of trial, the jury returned a verdict of guilty on seven of the eight counts filed against Appellant.[1]  On September 6, 2019, Appellant filed post-verdict motions challenging the sufficiency and weight of the evidence, which the court denied on September 18, 2019.  On January 16, 2020, the court imposed an aggregate sentence of 10 to 20 years' incarceration.  This timely appeal followed.

_____

[1] The court declared a mistrial on the remaining count.

Preliminarily, we note that Appellant's counsel has filed a brief pursuant to **Anders** and its Pennsylvania counterpart, **Commonwealth v. McClendon**. 434 A.2d 1185, 1187 (Pa. 1981). Where an **Anders**/**McClendon** brief has been presented, our standard of review requires counsel seeking permission to withdraw to: (1) petition the court for leave to withdraw, stating that after making a conscientious examination of the record, counsel has determined that the appeal would be frivolous; (2) furnish a copy of the brief to the defendant; and (3) advise the defendant that he has the right to retain private counsel or raise additional arguments that he deems worthy of the court's attention. **See Commonwealth v. Cartrette**, 83 A.3d 1030, 1032 (Pa. Super. 2013).

Counsel has complied with these procedural requirements. The petition to withdraw states that after a conscientious examination of the record, counsel has determined the appeal would be wholly frivolous. **See** Petition to Withdraw as Counsel, 4/19/21, at 1. Counsel certifies that he sent a copy of the **Anders** brief and the petition to withdraw to Appellant. **Id**. Additionally, counsel's letter advises Appellant of his right to retain private counsel or raise *pro se* any additional arguments he would like the Court to consider. **See** Letter from Christopher J. Martini, Esq. to Appellant, 4/19/21.

Regarding the substantive elements, the **Anders** brief accompanying counsel's petition to withdraw must: (1) summarize the procedural history and facts of record; (2) refer to anything in the record that counsel believes arguably supports the appeal; (3) set forth counsel's conclusion that the

appeal is frivolous; and (4) state counsel's reasons for concluding that the appeal is frivolous.  *See Santiago*, *supra* at 361.

Counsel's *Anders* brief summarizes the factual and procedural history of this case, identifies potential issues of arguable merit, and explains the basis for his conclusion that an appeal would be frivolous.  Because counsel has complied with these requirements, we "make a full examination of the proceedings and make an independent judgment to decide whether the appeal is in fact wholly frivolous."  *Id.* at 355 n.5.

The *Anders* brief identifies several issues of arguable merit challenging the weight and sufficiency of the evidence as to whether the victim had permitted Appellant to enter her home and consented to sex, the admission of evidence regarding the standing PFA Order governing the parties at the time of the crime, and the admission of Appellant's statement to arresting officers that he would "take a plea for three years" if it were offered to him.

The first issue identified by counsel is a claim that the jury's verdict was against the weight of the evidence.  Our standard of review is as follows:

> The finder of fact is the exclusive judge of the weight of the evidence as the fact finder is free to believe all, part, or none of the evidence presented and determines the credibility of the witnesses.
>
> As an appellate court, we cannot substitute our judgment for that of the finder of fact.  Therefore, we will reverse a jury's verdict and grant a new trial only where the verdict is so contrary to the evidence as to shock one's sense of justice.  A verdict is said to be contrary to the evidence such that it shocks one's sense of justice when "the figure of Justice totters on her pedestal," or when the jury's verdict, at the time of its rendition, causes the

trial judge to lose his breath, temporarily, and causes him to almost fall from the bench, then it is truly shocking to the judicial conscience. Furthermore, where the trial court has ruled on the weight claim below, an appellate court's role is not to consider the underlying question of whether the verdict is against the weight of the evidence. Rather, appellate review is limited to whether the trial court palpably abused its discretion in ruling on the weight claim.

*Commonwealth v. Boyd*, 73 A.3d 1269, 1275 (Pa.Super. 2013) (*en banc*) (quoting *Commonwealth v. Cruz*, 919 A.2d 279, 281–82 (Pa.Super. 2007) (citations omitted).

Here, Appellant's weight claim has been preserved through a timely post-sentence motion. *See* Pa.R.Crim.P. 607(A) ("A claim that the verdict was against the weight of the evidence shall be raised with the trial judge in a motion for a new trial: (1) orally, on the record, at any time before sentencing; (2) by written motion at any time before sentencing; or (3) in a post-sentence motion.") (emphasis added). *See also Commonwealth v. Burkett*, 830 A.2d 1034, 1037 (Pa. Super. 2003) (providing that a weight of the evidence claim "must be presented to the trial court while it exercises jurisdiction over a matter since [a]ppellate review of a weight claim is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence.") (citations and quotation marks omitted).

In the present case, the trial court found no merit to Appellant's weight of the evidence challenge, and it explained:

The [Appellant] asserts that . . . there was substantial credible evidence that a) the encounter was consensual and b) that the

victim permitted the [Appellant] to enter the victim's home. However, the facts outlined above are sufficient to support a finding that the [Appellant] was on direct notice that he was not permitted to have any contact with the victim; and, that he forcibly sexually assaulted her. The jury was free to accept either the [Appellant]'s assertion that the encounter was consensual , and he was permitted to enter the home, or, the victim's testimony that the encounter was not consensual and the [Appellant] was not permitted to enter the home. The victim testified that she repeatedly asked the [Appellant] to leave, said no to having sex with him, and told him to stop as he progressed from rubbing his penis on her face to penetrating her. The victim had given the [Appellant] prior notice that he was not permitted to have contact with her and not allowed at here [sic] residence, including obtaining and having a PFA Order served on him. The jury accepted this testimony as true. . . .

TCO, at 6-7. As the record supports the trial court's determination, we conclude the court did not palpably abuse its discretion in denying Appellant's weight of the evidence claim.

Similarly, Appellant's challenge to the sufficiency of the evidence also lacks merit.

The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying [the above] test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the trier of fact while passing upon the

- 17 -

credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Wright*, 846 A.2d 730, 736 (Pa.Super. 2004) (quoting *Commonwealth v. Bullick*, 830 A.2d 998, 1000 (Pa.Super. 2003)).

Under Pennsylvania decisional law, even "the uncorroborated testimony of a sexual assault victim, if believed by the trier of fact, is sufficient to convict a defendant." *Commonwealth v. Trippett*, 932 A.2d 188, 201 (Pa.Super. 2007) (citations omitted). Here, the victim's testimony, which the jury clearly credited, was sufficient to sustain Appellant's convictions.

Next, Appellant asserts the trial court improperly allowed the Commonwealth to question both the victim and Appellant about the PFA Order. In both the excerpt of the trial transcript reproduced, *supra*, and in the Pa.R.A.P. 1925(a) Opinion submitted on appeal, the trial court opines that it allowed reference to the parties' PFA Order once defense counsel persisted in asking questions on cross-examination of the victim—such as inquiring, "Never?", when the victim testified Appellant had lived in the home at the relevant time, or asking if Appellant had a key to the home—designed to imply that the victim routinely permitted Appellant's presence in the home and consented to sexual relations with him.

On this point, the trial court reasoned, "The defense clearly wanted the victim's credibility to be unsupported by the efforts she undertook to obtain a PFA Order and keep the Appellant from having contact with her. However, keeping this critically relevant information out of this case would constitute a travesty on the true facts in this case." TCO, at 8.

"The admission of evidence is committed to the sound discretion of the trial court, and a trial court's ruling regarding the admission of evidence will not be disturbed on appeal unless that ruling reflects manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support to be clearly erroneous." ***Commonwealth v. Ivy***, 146 A.3d 241, 250 (Pa.Super. 2016) (quoting ***Commonwealth v. Minich***, 4 A.3d 1063, 1068 (Pa.Super. 2010)).

Appellant appears to contest as an impermissible reference to prior bad acts the admission of testimony that a PFA Order prohibited him from contacting the victim or visiting her residence. However, it is clear from the record that the court's ruling did not amount to a significant departure from the parties' pre-trial stipulation that reference at trial may be made to an "Order" imposing the same prohibitions upon Appellant, nor did the court permit any reference to Appellant's particular prior acts that formed the basis to the existing PFA order.

Instead, the court allowed the Commonwealth to refer to the existing "PFA Order" to supply historic context to the relationship between the victim and Appellant in response to defense cross-examination of the victim designed to suggest that she was permitting Appellant to reside at her home and engaging in consensual sex with him at the time of the alleged burglary and rape.

In light of this limited use of the PFA Order, we find no abuse of discretion with the trial court's evidentiary ruling. While evidence of prior bad

- 19 -

acts may not be admitted to show criminal propensity, evidence of other crimes may be admissible if relevant to show some other legitimate purpose. ***Commonwealth v. Tyson***, 119 A.3d 353, 358 (Pa.Super. 2015). An exception to Rule 404(b)[2] permits the admission of evidence where it became part of the history of the case and formed part of the natural development of facts. ***Ivy***, 146 A.3d at 251. PFA petitions are admissible and relevant to demonstrate the continual nature of abuse and to show the defendant's motive, malice, intent, and ill-will toward the victim. ***Id***. (citing ***Commonwealth v. Drumheller***, 808 A.2d 893, 905 (Pa. 2002)).

Here, to the limited degree that the general reference to the standing PFA Order—without further description of the acts involved—constituted

---

[2] Rule 404(b) provides, in relevant part:

> **Rule 404. Character Evidence; Crimes or Other Acts**
>
> * * *
>
> **(b) Crimes, Wrongs or Other Acts.**
>
> (1) *Prohibited Uses*. Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.
>
> (2) *Permitted Uses*. This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. In a criminal case this evidence is admissible only if the probative value of the evidence outweighs its potential for unfair prejudice.

Pa.R.E. 404(b) (1), (2).

evidence of prior bad acts, such evidence "did not seek to inflame the jury's sensibilities with references to matters other than the legal proposition relevant to the case." *Commonwealth v. Antidormi*, 84 A.3d 736, 751 (Pa.Super. 2014). That is, the reference to the order sought only to "complete the story of the crime on trial by proving its immediate context of happenings near in time and place." *Commonwealth v. Brown*, 52 A.3d 320, 326 (Pa.Super. 2012).

Specifically, the trial court determined that the victim was permitted to explain that she had reasserted her rights under the PFA order even after she had briefly resumed her relationship with Appellant in violation of the order. Because the defense was attempting to impeach her credibility regarding her testimony that she had ended the relationship and personally forbade Appellant from visiting her home, the court found it was imperative that the victim be permitted to refer to the PFA Order and explain how, in the context of her history with Appellant, it emboldened her to ban him from her home and motivated her to lock the doors and engage in security measures to keep him out of the house. As we agree with the trial court's reasoning behind its evidentiary ruling under the given facts, we discern no arguable merit to this issue.

Appellant's final issue challenges the admission of his statement, made to arresting officers during his long-distance transport in a patrol car, offering to plead guilty in exchange for a three-year sentence. As described above, testimony confirmed that Appellant's statement was not only unsolicited but

was given after Chief Munn explicitly advised Appellant not to talk about the case, showed no interest in talking about the case with Appellant, and made no suggestion or gave any impression that he was authorized to negotiate a deal.

In **Commonwealth v. Wolf**, 510 A.2d 764 (Pa.Super. 1986), the appellant, a suspect in a rape investigation, walked into a police station and informed the investigating officer that he was under arrest for an unrelated crime and would admit to his involvement in the rape if the officer would offer appellant "a deal." **Id**. at 766. The officer informed the appellant that he was unable to make any such offer, as negotiations were the within the exclusive domain of the District Attorney. **Id**. Notwithstanding the investigator's admonition, the appellant confessed to his involvement in the rape. **Id**.

This Court affirmed the lower court's order denying the appellant's motion to suppress his confession. Specifically, we reasoned that precedent "condones the admission of any offer, whether it be made to a police officer or to an assistant district attorney handling the case, provided the Commonwealth showed no interest in participating in such discussions and the statements uttered were voluntary and unsolicited." **Id**. at 767.

Here, although Appellant was under arrest at the time he made his inculpatory offer, Chief Munn's explicit cautionary instruction that Appellant should resist any urge to communicate with him about the case made it entirely unreasonable for Appellant to believe that he was engaged in plea discussions at the time of his statement. Nor is there any indication of record

that Appellant held a subjective belief or expectation that negotiations regarding a possible plea had commenced. Rather, he was being transported by officers who unambiguously instructed him to refrain from talking in any sense about his case. Indeed, Appellant unilaterally acknowledged his awareness of the instructions he had received when he stated on several occasions, "Oh, that's right. We're not supposed to talk about that stuff." N.T. at 135.

Therefore, we conclude Appellant's statement offering to plead in exchange for a three-year sentence was voluntary and unsolicited, making his challenge to its admission at trial utterly devoid of merit. ***Compare Commonwealth v. Stutler***, 966 A.2d 594, 599–602 (Pa.Super. 2009) (holding arrestee's offer made to trooper was neither voluntary nor unsolicited, where trooper first asked arrestee about cooperating and then conveyed District Attorney's willingness to give county time in exchange).

Judgment of sentence affirmed. Petition to withdraw as counsel granted.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/3/2021

- 23 -